UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DANIELLE BUSCAINO,

               Plaintiff,                        **CASE NO. 1:22 CV 7572**

    v.

DIRCKSEN & TALLEYRAND, INC. d/b/a
RIVER CAFÉ and ARIEL ECHEVERRIA,

               Defendants.
-----------------------------------------------------------X

**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1 AND STATEMENT OF ADDITIONAL MATERIAL FACTS[1]**

    Pursuant to Local Civil Rule 56.1, Plaintiff submits her objections and responses to Defendant's statement of material fact in opposition to Defendant's motion for summary judgment.[2]

**Background on The River Café**

    1.    The River Café is an elegant fine dining restaurant located in Brooklyn, New York, notable for its sweeping view of the New York City skyline and Statue of Liberty. Steelman Dec. ¶ ___.[3]

          **Plaintiff's Response: Admit.**

    2.    The River Café employs a diverse workforce and is committed to maintaining a workplace free of discrimination, harassment, and retaliation. Steelman Dec. ¶ ___.

          **Plaintiff's Response: Deny** that The River Café is committed to
          maintaining a workplace free of discrimination, harassment and retaliation.

---

[1] The facts herein are deemed undisputed only for purpose of Plaintiff's accompanying Motion for Summary Judgment. Plaintiff reserves the right to dispute these assertions of fact should this action proceed to trial.

[2] In support of this counterstatement, Plaintiff submits the [DATE] Declaration of Leah Seliger ("Seliger Decl.") and exhibits attached thereto ("Seliger Ex. [INSERT]") and the [DATE] Declaration of Plaintiff ("Buscaino Decl.") and the [DATE] Declaration of Anthony ("Anthony Buscaino Decl.").

[3] "Steelman Dec." refers to the _____ Declaration of Executive Chef Brad Steelman, with exhibits, submitted herewith.

(Buscaino Tr. 132:13-134:22; 136:14-21; 215:17-216:5).

3.     The River Café is committed to fostering an inclusive workplace and makes all employment-related decisions based on merit, qualifications, and job-related performance without regard to characteristics such as gender. Steelman Dec. ¶ __.

**Plaintiff's Response: Deny.** (Buscaino Tr. 133:3-9, 142:18-143:25, 145:9-14).

*Scott Stamford*

4.     Scott Stamford ("Stamford") was the General Manager of The River Café for twenty-three years before retiring on October 13, 2023. Stamford Tr. 12:19-13:4.[4]

**Plaintiff's Response: Admit.**

5.     As General Manager, Stamford oversaw the daily operations of The River Café except for the kitchen, which was under the purview of Executive Chef Brad Steelman. Stamford Tr. 13:5-11.

**Plaintiff's Response: Admit.**

*Chef Brad Steelman*

6.     Chef Brad Steelman ("Chef Steelman") has been the Executive Chef of The River Café for the past 24 years. Steelman Tr. 10:23-24; 11:2-3.[5]

**Plaintiff's Response: Admit.**

7.     As Executive Chef, Chef Steelman is responsible for, among other things, menu creation, execution of service, overseeing ordering, and supervising the kitchen staff. Steelman Tr. 11:4-8.

---

[4] "Stamford Tr." refers to the October 18, 2023 transcript of the deposition of Scott Stamford, portions of which are annexed to the _____ Declaration of Craig R. Benson, Esq. ("Benson Dec.") as Exhibit ___.
[5] "Steelman Tr." refers to the October 18, 2023, transcript of the deposition of Chef Brad Steelman, portions of which are annexed to Benson Dec. as Exhibit ___.

**Plaintiff's Response: Admit.**

8.     As Executive Chef, Chef Steelman oversees all personnel and is responsible for hiring, firing, disciplinary, and promotion decisions for all employees who work in the kitchen at The River Cafe. Steelman Tr. 11:4-8; 11:9-15, 11:16-23, 11:25-12:7, 13:18-20; Stamford Tr. 13:15-14:6; Buscaino Tr. 61:19-24, 89:6-14.[6]

**Plaintiff's Response: Admit.**

9.     Chef Steelman supervises the culinary team at The River Café that includes a Sous Chef, an Executive Pastry Chef, and line cooks. Steelman Tr. 13:18-24; Buscaino Tr. 61:19-24, 89:6-14.

**Plaintiff's Response: Admit.**

*Ariel Echevarria*

10.     Ariel Echevarria ("Echevarria") has been the Sous Chef of The River Café for over 17 years. Echevarria Tr. 8:5-7, 8:8-10.[7]

**Plaintiff's Response: Admit.**

11.     As Sous Chef, Echevarria is responsible for butchering meat, making sauces, expediting service, and ensuring that food items are stored properly in The River Café's kitchen. Echevarria Tr. 8:11-9:22.

**Plaintiff's Response: Admit.**

12.     As Sous Chef, Echevarria is responsible for quality control, meaning, he reviews and ensures the quality and preparation of the dishes meets the standards of the restaurant. Steelman Dec. ¶ __.

---

[6] "Buscaino Tr." refers to the September 27, 2023, transcript of the deposition of Plaintiff Danielle Buscaino, portions of which are annexed to the Benson Dec. as Exhibit ___.
[7] "Echevarria Tr." refers to the October 18, 2023, transcript of the deposition of Ariel Echevarria, portions of which are annexed to the Benson Dec. as Exhibit ___.

**Plaintiff's Response: Admit.**

13.     As Sous Chef, Echevarria provides guidance to the line cooks in terms of their cooking, preparation, and station cleanliness. Steelman Tr. 34:8-25; Buscaino Tr. 74:19-75:4.

**Plaintiff's Response: Admit.**

14.     Only the Executive Chef supervises the line cooks at The River Café. Steelman Dec. ¶ ___; Buscaino Tr. 95:10-14 (Echevarria, as Sous Chef, did not supervise Buscaino, as a line cook).

> **Plaintiff's Response: Deny.** (Buscaino Tr. 42:24-43:2; 61:4-24, 93:17-94:9)

15.     As the Sous Chef, Echevarria is not responsible for the hiring, firing, discipline, or promotion decisions for any employees at The River Café. Steelman Dec. ¶ __; Buscaino Tr. 88:23-89:14.

> **Plaintiff's Response: Deny.** The Sous Chef had responsibility for supervising, disciplining, and evaluating the performance of employees (including Plaintiff) and was involved in decisions about employee raises and promotions (including Plaintiff's possible raise and promotion). (Buscaino Tr. 42:24-43:16, 61:4-24, 71:6-8, 91:24-93:18 (testifying that Steelman stated he could not provide Plaintiff with a raise until he confirmed that others, including Echevarria, were "onboard" with it), 87:12-22, 95:10-25 (testifying Steelman admitted he had to discuss Plaintiff's possible promotion with Echevarria).

16.     Echevarria was not Buscaino's supervisor during her employment with The River Café. Buscaino Tr. 95:13-14.

**Plaintiff's Response: Deny.** (Buscaino Tr. 61:4-24, 71:6-8.)

*The Kitchen Hierarchy*

17.     The following hierarchy exists in The River Café's kitchen: the Executive Chef; the Sous Chef; line cooks; and prep staff. Steelman Tr. 29:18-22.

**Plaintiff's Response: Admit.**

18.     There is also a pastry department at The River Café, which includes the Executive Pastry Chef and Pastry Sous Chef. Steelman Dec. ¶ ___.

**Plaintiff's Response: Admit.**

19.     Each line cook is assigned to a station. The stations include: Garde Manger (cold station), hot appetizer, middle, grill, fish, lobster, and amuse-bouche. Echevarria Tr. 15:20-16:14; Steelman Dec. ¶ _.

**Plaintiff's Response: Admit.**

20.     At the time Plaintiff Danielle Buscaino ("Plaintiff" or "Buscaino") started working at The River Café in 2019, the kitchen staff included two line cooks on the Garde Manger station, one line cook on the hot appetizer station, one line cook on the middle station, one line cook on the grill station, one line cook on the fish station, one line cook on the amuse-bouche station, and the pastry department. Buscaino Tr. 44:9-14, 44:25-45:7.

**Plaintiff's Response: Admit.**

21.     There is no hierarchy among the line cook stations, and all are equally as important. Steelman Tr. 44:6-14.

**Plaintiff's Response: Deny.** (Buscaino Tr. 46:19-21, 84:2-24, 86:3-5)

22.     That said, a line cook with limited experience generally starts on the Garde Manger station and has the opportunity to rotate to stations that require more skill, such as the grill station. Steelman Tr. 44:6-14, 46:22-47:5; Buscaino Tr. 46:16-24; 84:9-17.

> **Plaintiff's Response: Deny** that line cooks with limited experience have the opportunity to rotate to stations that require more skill, such as the grill station. (Buscaino Tr. 84:2-86:5 (testifying that most line cooks remained in their role for the entirety of their employment, and that she was able to move up to the "more senior job" of the grill station, and receive a commensurate raise, only because the line cook assigned to the grill station left)).

23.     Line cooks are responsible for cleaning at the end of each meal service, which includes scrubbing and wiping down their individual stations. Buscaino Tr. 146:2-14; Steelman Dec. ¶ __.

**Plaintiff's Response: Admit.**

*Timothy Durkos*

24.     Timothy Durkos ("Durkos") was a Sous Chef at The River Café's sister operation, Plum's, from July 2018 to April 2019. Steelman Dec. ¶ __.

**Plaintiff's Response: Admit.**

25.      When Plum's closed in 2019, The River Café offered Durkos the opportunity to join the kitchen staff at The River Cafe. Steelman Tr. 22:23-23:10; Buscaino Tr. 51:15-52:8.

**Plaintiff's Response: Admit.**

26.     Because he already had the title of Sous Chef while employed at Plum's, and for payroll purposes only, The River Café maintained Durkos' title when he transferred to The River Café, despite the fact that he was joining the kitchen staff there with the responsibilities of a line cook. Steelman Tr. 24:6-17; Echevarria Tr. 22:21-23:6; Buscaino Tr. 64:7-13.

**Plaintiff's Response: Deny.** (Buscaino Tr. 50:25-51:14).

27.     The River Café does not have a junior sous chef position and did not have a junior sous chef position at any point during Buscaino's employment there. Steelman Tr. 63:16-22; Buscaino Tr. 44:9-14, 44:25-45:7 (confirming no junior sous position existed when she was hired at The River Café), 67:6-7, 67:10 (confirming there was no junior sous chef at The River Café prior to or after Timothy Durkos' employment with The River Café).

> **Plaintiff's Response: Deny.** (Buscaino Tr. 50:25-51:14 (testifying that Durkos was introduced as "the junior sous chef" upon his hiring), 61:25-62:4 (testifying that, as "the junior sous chef," Durkos was Plaintiff's supervisor)).

**Relevant Employment Policies at The River Café**

28.     River Café maintains an anti-sexual harassment policy and an anti-discrimination policy. Stamford Tr. 18:5-7, 18:22-24; Steelman Tr. 20:22-24, 21:11-18.

**Plaintiff's Response: Admit.**

29.     Employees who believe they are experiencing harassment or discrimination are encouraged to report the inappropriate conduct to their direct supervisor or to the General Manager. Steelman Tr. 21:25-7; Stamford Tr. 19: 20-25.

**Plaintiff's Response: Admit.**


**Buscaino's Employment Background and Employment with the River Café**

30.     The River Café hired Buscaino in August 2019 as line cook. Buscaino Tr. 44:6-8; Steelman Tr. 46:10-13.

**Plaintiff's Response: Admit.**

31.     Chef Steelman interviewed Buscaino for the line cook position and made the decision to hire her. Buscaino Tr. 41:23-42:3, 88:17-22; Steelman Tr. 46:5-9.

**Plaintiff's Response: Admit.**

32.     Buscaino only met with Echevarria after she was hired by The River Cafe, and did not interview with him. Buscaino Tr. 42:4-7.

**Plaintiff's Response: Admit.**

33.     Based on her limited cooking experience post-culinary school, Buscaino was hired as a line cook, which is an entry-level position at The River Café. She started working on the Garde Manger station. Buscaino Tr. 46: 16-21; Steelman Tr. 46:22-47:5.

> **Plaintiff's Response: Deny** Plaintiff was hired as a line cook based on her limited cooking experience post-culinary school. (Buscaino Decl. []). **Admit** the

remainder of the paragraph.

34.     Buscaino moved to the hot appetizers station after working on the Garde Manger station for approximately two months. Buscaino Tr. 56:22-57:15.

**Plaintiff's Response: Admit.**

35.     The River Café closed due to the COVID-19 pandemic from March 2020 until December 2020. Buscaino Tr. 52:18-53:10.

**Plaintiff's Response: Admit.**

36.     Upon The River Café's re-opening in December 2020, Buscaino was assigned to the grill station. Buscaino Tr. 57:8-15.

**Plaintiff's Response: Admit.**

37.     The line cook assigned to the grill station is responsible for cooking meat to the desired/necessary temperature, portioning steaks, scoring duck breasts, and seasoning and rendering meat prior to service. Steelman Tr. 48:20-50:5.

**Plaintiff's Response: Admit.**

38.     The line cook assigned to the grill station is also responsible for properly wrapping and storing raw meat in the walk-in refrigerator. Buscaino Tr. 128:6-22.

**Plaintiff's Response: Admit.**


***Buscaino's Work At The River Cafe***

39.     While assigned to the grill station, Buscaino regularly undercooked meat, resulting in customers sending plates back to the kitchen. Echevarria Tr. 28:10-13, 29:5-21; Steelman Tr. 43:6-8; Buscaino Tr. 80-81 (meat was sent back a few times while Buscaino was assigned to the grill station).

**Plaintiff's Response: Deny.** (Buscaino Tr. 80:9-18, 81:12-82:13).

40.     Buscaino was provided instruction on proper grilling techniques, but Buscaino was not receptive to this feedback. Steelman Tr. 42:23-43:10.

> **Plaintiff's Response: Admit** that Buscaino was provided instruction on proper grilling techniques but **deny** Buscaino was not receptive to this feedback. (Buscaino Tr. 90:10-91:12, Buscaino Decl. []).

41.     As part of service, line cooks are required to call back orders from the chef to acknowledge the order. Echevarria Tr. 32:19-24.

> **Plaintiff's Response: Admit.**

42.     Buscaino regularly ignored these call backs and did not answer back, frustrating others in the kitchen. Echevarria Tr. 32:16-33:4.

> **Plaintiff's Response: Deny.** (Buscaino Decl. []).

43.     Echevarria spoke with Buscaino several times about her failure to call back orders and cook meat to the proper temperature. Echevarria Tr. 35:13-20, 36:10-18.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 80:13-18 (testifying Echevarria never spoke to her about her meat temperatures being off); Buscaino Decl. []).

44.     Shortly after Buscaino rotated to the grill station, she began disappearing towards the end of service to use her cell phone. Echevarria Tr. 26:11-17; Steelman Tr. 43:9-10, 72:5-9.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 76:25-77:8, 131:13-15; Buscaino Decl. []).

45.     Buscaino's disappearances at the end of service forced the rest of the line cooks to clean her station and put items away. Echevarria Tr. 42:12-23.

> **Plaintiff's Response: Deny.** (Buscaino Decl. []).

46.     Other line cooks were frustrated by Buscaino's lack of assistance with cleaning and expressed as such to Echevarria and Chef Steelman. Echevarria Tr. 45:13-46:2; Steelman Tr. 79:18-24, 80:7-24.

9

> **Plaintiff's Response: Deny.** (Buscaino Decl. []).

47.     Echevarria spoke to Buscaino a few times and explained that she needed to assist with clean-up efforts in the kitchen, as all line cooks are required to do. Echevarria Tr. 43:12-16.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 69:18-70:9  (testifying that Echevarria criticized her for not cleaning fast enough, rather than not cleaning up at all), 76:25-77:8, 79:17-22; Buscaino Decl. []. Moreover, Echevarria began to criticize Plaintiff about "little things" only after she expressed interest in the junior sous chef position. (Buscaino Tr. 69:18-70:5)).

***Buscaino's Conversations About Advancement in the Culinary Profession***

48.     Buscaino considered Echevarria and Chef Steelman her mentors. Buscaino Tr. 210:17-22.

> **Plaintiff's Response: Admit.**

49.     Chef Steelman had a conversation with Buscaino about her desire to advance in the culinary industry, and told her that to do so, she needed to know the workings of the entire kitchen, including the pastry department. Steelman Tr. 62:11-22, 63:23-64:6.

> **Plaintiff's Response: Deny** that the conversation was about Buscaino's desire to advance in the culinary industry generally (she specifically wanted to advance in The River Café kitchen) (Buscaino Tr. 58:23-59:8, 69:11-17, 70:21-71:5, 75:18-21, 86:18-24, 92:4-93:20)**. Admit** the remainder of the paragraph.

50.     Chef Steelman encouraged Buscaino (and other line cooks) to learn about the pastry department by providing them the opportunity to work with the pastry chef. Steelman Tr. 63:23-64; 67:14-68:8.

> **Plaintiff's Response: Admit.**

51.     At no point during Buscaino's employment at The River Café was a promotion available for any of the line cooks, as the only kitchen positions that existed above that of line cook

were Sous Chef, Executive Pastry Chef, Pastry Sous Chef, and Executive Chef, all of which were filled for the duration of Buscaino's employment. Steelman Dec. ¶ __.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 50:25-51:14, 66:13-20, 67:21-68:8 (testifying that Durkos was a junior sous chef), 92:4-93:20 (testifying that she spoke to Steelman about the junior sous chef position).

52.     Chef Steelman never spoke to Buscaino about any promotion, nor her desire to be promoted. Steelman Tr. 71:14-16.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 58:23-59:8, 69:11-17, 70:21-71:5, 75:18-21, 86:18-24, 92:4-93:20).

53.     Buscaino received several raises during her employment with The River Café. 86:6-7.

> **Plaintiff's Response: Admit.**

*The December 17, 2021 Incident*

54.     On December 17, 2021, at the end of service, Buscaino again left the kitchen, leaving the other line cooks to clean up the grill station, which she was assigned to. Echevarria Tr. 42:5-12; 44:3-7.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 130:10-131:18, 145:23-147:7; Buscaino's Journal P037-P038).

55.     When Buscaino returned to the kitchen, Echevarria informed her that she needed to clean up her station. Echevarria Tr. 42:8-43:3; 44:3-7; Buscaino Tr. 146:22-147:4.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 145:23-147:7)

56.     In response, Buscaino snapped at Echevarria, screaming and yelling at him. Echevarria Tr. 43:12-21.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 145:23-148:22; Buscaino's Journal P037-P038).

57.     Echevarria raised his voice in response to Buscaino's confronting him so that he could be heard. Echevarria Tr. 44:5-12.

          **Plaintiff's Response: Deny.** (Buscaino Tr. 145:23-148:22; Buscaino's Journal P037-P038).

58.     Buscaino subsequently left the kitchen and went to Chef Steelman's office. Buscaino Tr. 147:8-12; Compl. ¶ 32.[8]

          **Plaintiff's Response: Admit.**

59.     Buscaino was visibly upset, on the verge of tears, and was yelling so loudly that Chef Steelman could not make out what she was saying. Steelman Tr. 74:21-75:20; Buscaino Tr. 152:25-153:9, 154:7-10 (admitting she was speaking loudly).

          **Plaintiff's Response: Deny** that Buscaino was yelling so loudly that Chef Steelman could not make out what she was saying. (Buscaino's Journal P037-P038; Buscaino Tr. 152:25-153:9; Stamford Tr. 27:22-28:17). **Admit** that Buscaino was visibly upset.

60.     As it was obvious that Buscaino was agitated, Chef Steelman told her that she should take the next day off, with pay, while he looked into what had transpired that evening. Steelman Tr. 74:21-75:20, 85:12-22; Buscaino Tr. 147:8-16.

          **Plaintiff's Response: Deny** that Chef Steelman told Buscaino that she "should" take the day off' (Buscaino Tr. 194:25-196:9 (testifying that Steelman told her she "could" take the day off if she wanted, not that she was "not physically allowed to work" that day), and **admit** the remainder of the paragraph.

61.     Buscaino did not tell Chef Steelman during this conversation that she believed she was being discriminated against because of her gender. Steelman Tr. 82:14-17; Buscaino Tr. 147:8-18.

          **Plaintiff's Response: Deny.** (Buscaino Tr. 221:15-222:18).

---

[8] "Compl." refers to the Complaint e-filed by Plaintiff Danielle Buscaino as ECF No. 1.

62.     Buscaino returned to the kitchen after speaking to Chef Steelman on December 17. Echevarria Tr. 47:3-5; Compl. ¶ 34.

**Plaintiff's Response: Admit.**

63.     After speaking to Chef Steelman, she walked in front of Echevarria as he pulled a tray of lamb out of the blast chiller, showing Buscaino that she had not properly covered and stored the lamb as she was required to as the line cook assigned to the grill that evening. Buscaino Tr. 147:18-25, 183:3-6; Echevarria Tr. 47:7-13.

> **Plaintiff's Response: Deny** that Echevarria showed Buscaino that she had not properly covered and stored the lamb as she was required to as the line cook assigned to the grill that evening. (Buscaino Tr. 182:6-16, 189:18-191:7; Buscaino Decl. []). **Admit** remainder of the paragraph.

64.     Echevarria then turned around and put the tray on a nearby table so he could wrap and cover the meat properly and return it to the blast chiller. Echevarria Tr. 47:13-14, 47:18-21; Buscaino Tr. 182:17-183:2, 184:18-25, 189:6-9.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 182:6-16, 189:18-191:7; Buscaino Decl. []).

### *Buscaino's Father Calls Chef Steelman*

65.     After leaving the restaurant on December 17, 2021, Buscaino called her father, Anthony Buscaino, and informed him of the incident that occurred with Echevarria in the kitchen. A. Buscaino Tr. 21:10-19.[9]

**Plaintiff's Response: Admit.**

66.     Following his conversation with his daughter, Anthony Buscaino called Chef Steelman. Steelman 82:25-83:7.

---

[9] "A. Buscaino Tr.." refers to the November 7, 2023, transcript of the deposition Anthony Buscaino, portions of which are annexed to the Benson Dec. as Exhibit ___.

**Plaintiff's Response: Admit.**

67.     Chef Steelman felt threatened during the conversation with Anthony Buscaino, as he recalls he said something to the effect of, "if you don't do something, I'm going to come down there and do something." Steelman Tr. 82:25-83:16; Stamford Tr. 40:21-24.

>    **Plaintiff's Response: Deny.** (Anthony Buscaino Tr. 25:13-26:12; Anthony Buscaino Decl. []).

68.     During this phone call, Anthony Buscaino did not tell Chef Steelman that Buscaino believed Echevarria's behavior on December 17, 2021 was because of her gender. Steelman Dec. ¶ __, A. Buscaino Tr. 25:13-26:12.

>    **Plaintiff's Response: Admit.**

***Despite Chef Steelman's Instruction, Buscaino Reports to Work on December 18, 2021***

69.     Despite Chef Steelman's instruction to stay home with pay, Buscaino reported to work at the restaurant the day after the December 17 incident. Buscaino Tr. 195:24-196:9; Steelman Tr. 101:4-9, 101:19-24; Stamford Tr. 37:2-17.

>    **Plaintiff's Response: Deny** that Chef Steelman instructed Buscaino she could not come to work the day after the December 17 incident. (Buscaino Tr. 194:25-196:9). **Admit** the remainder of the paragraph.

***Investigation of the December 17, 2021 Incident***

70.     The following day, on December 18, Chef Steelman asked Stamford to investigate the incident that occurred on December 17. Steelman Tr. 77:15-18, 101:19-24; Stamford Tr. 28:3-17, 29:8-13.

>    **Plaintiff's Response: Deny.** (Steelman Tr. 103:3-104:3).

71.     Stamford spoke to employees who were working on the night of December 17 to find out what occurred. Stamford Tr. 31:10-17, 42:10-23.

**Plaintiff's Response: Deny** that Stamford spoke to employees who were working on the night of December 17, 2021 prior to the filing of the Complaint in this action. (Fowles Tr. 23:13-24:3 (testifying that Stamford spoke to him for the first time about the December 17, 2021 incident in the summer of 2023); Cruz Tr. 15:7-13 (testifying that Stamford spoke to him about the incident for the first time in July 2023). **Admit** Stamford spoke to employees in July 2023 (after the initiation of this litigation) who had been working on the night of December 17, 2021.

72.     Each employee interviewed confirmed they heard a woman screaming in the kitchen, and confirmed they did not hear any other voices from the kitchen on the evening of December 17, 2021, only a woman screaming. Stamford Tr. 47:14-19.

**Plaintiff's Response: Admit.**

73.     Specifically, Andrew (Andy) Fowles ("Fowles"), the Captain and Maître D' at The River Café, told Stamford that he was in the dining room when he heard a loud female voice emanating from the kitchen on December 17. Fowles Tr. 8:5-9, 20:8-12, 20:20-22, Ex. ___.[10]

**Plaintiff's Response: Admit.**

74.     There were still customers in the dining area when Fowles heard the female voice yelling from the kitchen on December 17. Fowles Tr. 21:13-21.

**Plaintiff's Response: Admit.**

75.     Bernardo Cruz, Micheal Peggins, and Dane Springer also informed Stamford that they recalled hearing a woman yelling from the kitchen on December 17. Stamford Tr. 9:13-20, 9:22-25, 10:18-22, 49:5-8, 49:15-24; Cruz Tr. 14:12-25, 15:3-6, 16:8.[11]

**Plaintiff's Response: Admit.**

---

[10] "Fowles Tr." refers to the November 13, 2023, transcript of the deposition of Andrew Fowles, portions of which are annexed to the Benson Dec., with exhibits, as Exhibit ___.

[11] "Cruz Tr." refers to the November 13, 2023, transcript of the deposition of Bernardo Cruz, portions of which are annexed to the Benson Dec., with exhibits, as Exhibit ___.

76.     Thus, Stamford's investigation confirmed that a woman's voice could be heard yelling from the kitchen as far as the dining room, where guests were dining, on the evening of December 17, 2021. Stamford Tr. 45:25-46:24.

>    **Plaintiff's Response: Deny** that Stamford's "investigation" prior to the filing of the Complaint in this action confirmed anything. (Fowles Tr. 23:13-24:3 (testifying that Stamford spoke to him for the first time about the December 17, 2021 incident in summer of 2023); Cruz Tr. 15:7-13 (testifying that Stamford spoke to him about the December 17, 2021 incident for the first time in July 2023). **Admit** Stamford confirmed in July 2023 (after this litigation began) that a woman's voice could be heard yelling from the kitchen by employees who had been working on the night of December 17, 2021.

77.     Stamford reporting [sic] his findings to Chef Steelman. Steelman Dec. ⁋ ___.

>    **Plaintiff's Response: Deny** that Stamford had any findings to report prior to the filing of the Complaint in this action. (Fowles Tr. 23:13-24:3; Cruz Tr. 15:7-13).

78.     Due to the results of Stamford's investigation, which confirmed Buscaino's inappropriate conduct in the kitchen on December 17, 2021, and Buscaino's disregard of Chef Steelman's instruction to stay home (with pay), Chef Steelman decided to terminate Buscaino's employment. Steelman Dec. ⁋ __; Steelman Tr. 100:2-6, 106:5-6.

>    **Plaintiff's Response: Deny** Stamford investigated the December 17 incident prior to the filing of the Complaint in this action. (Fowles Tr. 23:13-24:3; Cruz Tr. 15:7-13). **Deny** Chef Steelman decided to terminate Buscaino's employment because of Buscaino's disregard of Chef Steelman's instruction to stay home (with pay). (Stamford Tr. 45:15-47:2 (testifying Buscaino was fired for screaming and other performance issues); Buscaino Tr. 202:9-203:23 (testifying she was told she was fired because her "story" did not match with what "other people" said); Buscaino Decl. []).

79.     Echevarria was not involved in the decision to terminate Buscaino's employment with The River Café. Echevarria Tr. 41:13-15.

>    **Plaintiff's Response: Admit.**

**Buscaino's Legal Claims**

80.     Buscaino alleges that Echevarria made comments about her appearance and told her that she "clean[ed] up nice" and "look[ed] good" when she was attending a friend's bridal shower at The River Café as a guest and was wearing "normal clothes" instead of her work uniform. Buscaino Tr. 132:17-133:5, 133:10-15; Compl. ¶ 16.

**Plaintiff's Response: Admit.**

81.      Buscaino stated that, on one occasion, Echevarria told her that her eyelashes were pretty. Buscaino Tr. 136:12-19.

**Plaintiff's Response: Admit.**

82.     Buscaino alleges that on one occasion while she was working with Echevarria, he commented that "since [she] was pretty [she] didn't have to do much" and that "someone would take care of things." Buscaino Tr. 133:3-9, 135:12-136:11.

**Plaintiff's Response: Admit.**

83.     Buscaino did not hear Echevarria say anything she considered to be inappropriate to any other woman or man in the kitchen. Buscaino Tr. 137:3-14.

**Plaintiff's Response: Admit.**

84.     No other line cooks or kitchen employees at The River Café engaged in conduct that Buscaino considered to be discriminatory. Buscaino Tr. 216:6-11.

**Plaintiff's Response: Admit.**

85.     Buscaino testified that Echevarria began criticizing her work after she allegedly spoke with Chef Steelman about her desired promotion. Compl. ¶ 26; Buscaino Tr. 70:18-71:5, 138:19-139:12, 143:10-25.

**Plaintiff's Response: Admit.**

86.     Per Buscaino, Echevarria's criticism of her work was "in retaliation for" her claimed conversation with Chef Steelman about a promotion. Buscaino Tr. 75:18-21, 76:4-7.

**Plaintiff's Response: Admit.**

87.    Buscaino admitted she does not claim that Echevarria had a problem with women, but rather, she believed that he had an issue with her because she allegedly requested a promotion. Buscaino Tr. 137:25-138:7.

**Plaintiff's Response: Admit.**

88.    Buscaino testified that prior to her conversation with Chef Steelman about a promotion, Echevarria "would always give [her] compliments and tell [her] that [she] was doing well in [her] work." Buscaino Tr. 138:19-139:5.

**Plaintiff's Response: Admit.**

89.    Buscaino testified that Echevarria's change in attitude towards her led her to believe he had an issue with her because she was a woman. Buscaino Tr. 138:8-18, 138:19-139:12, 142:18-143:5.

> **Plaintiff's Response: Admit** Buscaino believed Echeverria had an issue with her because she was a woman who was "trying to come up in the industry." (Buscaino Tr. 216:22-217:4 (testifying that she believed she was discriminated against by Echevarria for being a "woman trying to come up in the industry.")**.**

90.    Buscaino claims that the entirety of Echevarria's criticism of her work in the kitchen included being told on a couple of occasions that she was not fast enough at getting food out to customers and that she was not fast enough at cleaning. Buscaino Tr. 69:22-70:9, 79:22.

> **Plaintiff's Response: Admit.** Moreover, Echevarria began to criticize Plaintiff about these "little things" only *after* she expressed interest in the junior sous chef position. (Buscaino Tr. 69:18-70:5).

91.    Buscaino alleges that Echevarria criticized her on two or three occasions for speaking with her colleagues while working, even though he allowed two male line cooks to do the same without issue. Buscaino Tr. 138:8-18, 141:5-10; Compl. ¶ 27.

**Plaintiff's Response: Admit.**

92.     Per Buscaino, the only person who criticized her work at The River Café was Echevarria. Buscaino Tr. 69:14-17.

**Plaintiff's Response: Admit.**

93.     Per Buscaino, the only person at The River Café who retaliated against her was Echevarria. Buscaino Tr. 219:17, 19, 21, 24-25.

> **Plaintiff's Response: Deny.** The quoted citations address only Plaintiff's belief that Echevarria "retaliated" against her for "tr[ying] to move up at The River Café." (Buscaino Tr. 219:3-21). Plaintiff was retaliated against by Defendants when Defendants terminated her after she reported sexual harassment. (Buscaino Decl. []).

94.     Buscaino was never written up, disciplined, or otherwise suffered any adverse employment action as a result of Echevarria's alleged attitude towards her. Buscaino Tr. 144:2-15.

**Plaintiff's Response: Admit.**

95.     Buscaino alleges she told two co-workers, Destiny and a banquet cook, that she believed Echevarria's behavior towards her on December 17, 2021 was based on her gender. Buscaino Tr. 177:22-178:12.

**Plaintiff's Response: Admit.**

96.     Buscaino admitted that her discussion with Chef Steelman about Echevarria was that she felt there was tension between her and Echevarria. Buscaino Tr. 175-176.

> **Plaintiff's Response: Deny.** (Buscaino Tr. 221:22-222:5 (testifying that she reported to Steelman that the December 17 incident occurred because she was "a woman trying to come up" in the restaurant).

97.     Buscaino admitted she was not written up nor was she disciplined during her employment with The River Café. Buscaino Tr. 144:4-5, 144:8.

**Plaintiff's Response: Admit.**

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

I.      **Plaintiff's Personal & Employment Background**

98.     Buscaino graduated from the Culinary Institute of America ("CIA") in 2017. (Buscaino Tr. 37:13-17).

99.     The CIA is considered the premier culinary arts school in this country. (Buscaino Decl. []).

100.    Buscaino saw a job posting online for a line cook position with The River Café in or around July 2019 and submitted an application. (Buscaino Decl. []; Plaintiff's Job Application, P002-P004).

101.    Buscaino was interviewed by and offered the line cook position by Chef Steelman. (Plaintiff's Job Application, P002-P004; Buscaino Tr. 41:23-25; Steelman Tr. 46:5-6).

102.    Buscaino was qualified for the position based on her experience working as a line cook both before and during her studies at the CIA and based on her graduation from the premier culinary school in the country. (Buscaino Tr. 37:13-38:11, 39:18-22, 54:11-20).

103.    Buscaino began working for The River Café in August 2019. (Buscaino Tr. 44:6-8).

104.    Buscaino's direct supervisor was Chef Steelman. (Buscaino Tr. 60:25-61:24).

105.    Buscaino was also supervised by Echevarria. (Buscaino Tr. 60:25-61:24).

106.    Buscaino began her employment at the Garde Manger, also referred to as "garmache," station. (Buscaino Tr. 46:16-24).

107.    The Garde Manger station, which handles salads and cold appetizers, is considered an entry level station. (Buscaino Tr. 46:18-20).

108.     Buscaino was soon elevated to the hot appetizers station, which requires more skill. (Buscaino Tr. 57:5-15).

109.     The grill station is considered the highest level among the line cooks because it handles the most expensive ingredients – meat and poultry – and involves the highest level of skill. (Buscaino Tr. 84:6-24).

110.     Buscaino was never written up for performance or any other reason during her employment at The River Café. (Buscaino Tr. 69:7-10, 142:6-12).

111.     Buscaino received four raises during her employment with The River Café. (Buscaino's Pay History, Defendants00100).

112.     Buscaino received many compliments on her good performance during her employment with The River Café from Echevarria and Chef Steelman. (Buscaino Tr. 92:20-93:10, 138:19-139:5).

113.     Echevarria also frequently made inappropriate comments about Plaintiff's appearance. (Buscaino Tr. 132:13-133:23, 134:16-22, 136:12-19).

114.     Buscaino did not report this inappropriate behavior because she feared retaliation and she saw that The River Café openly tolerated sexual harassment from the highest level of management. (Buscaino Decl. []; Buscaino Tr. 215:17-216:5).

115.     Buscaino witnessed The River Café owner Buzzy O'Keefe sexually harassing the hostesses. (Buscaino Tr. 215:17-216:5).

116.     The vast majority of the kitchen staff at The River Café was male. (Buscaino Tr. 46:25-48:18).

117.     In or about 2019, The River Café hired Tim Durkos as a Junior Sous Chef. (Buscaino Tr. 52:6-8).

118.    Durkos was introduced to Buscaino and the rest of the kitchen staff as the Junior Sous Chef. (Buscaino Tr. 50:25-51:14).

119.    The River Café closed in March 2020 because of the COVID-19 pandemic. (Buscaino Tr. 52:18-53:10).

120.    The River Café reopened in or about December 2020. (Buscaino Tr. 52:18-53:10).

121.    Durkos did not return to The River Café when it reopened. (Buscaino Tr. 52:14-17).

122.    Defendants rehired Buscaino when The River Café reopened, and Buscaino was elevated to the grill station. (Buscaino Tr. 57:12-15).

123.    In or about August 2021, Buscaino initiated a conversation with Chef Steelman about her interest in advancing to the Junior Sous Chef position. (Buscaino Tr. 92:4-16).

124.    Chef Steelman said he could see Buscaino advancing into the Junior Sous Chef position and said he would discuss it with Echevarria, O'Keefe and Stamford. (Buscaino Tr. 92:20-93:10).

125.    Chef Steelman told Buscaino to familiarize herself with the pastry department in preparation for advancing to the Junior Sous Chef position. (Buscaino Tr. 92:20-93:10).

126.    Soon after that conversation, Echevarria acknowledged that he knew about Buscaino's aspirations by saying, "oh, you're looking to move up." (Buscaino Tr. 101:13-22).

127.    Echevarria changed his behavior toward Buscaino after she voiced her aspirations to Chef Steelman. Echevarria began criticizing Busciano for behavior that he permitted among the male line cooks. Echevarria became critical of the speed at which Buscaino cleaned her station, which had not been an issue prior to her interest in the Junior Sous Chef role. (Buscaino Tr. 69:11-71:5).

22

128.   On December 17, 2021, Buscaino was closing down her station and briefly left her station to put away her tools. (Buscaino Tr. 145:23-147:14).

129.   When Buscaino came back to her station, Echevarria started yelling in her face and cursing at her, and telling her that she's not better than anyone else and that she doesn't "fucking do anything." (Buscaino Tr. 145:23-148:22).

130.   Buscaino felt very threatened and believed that his extreme behavior was the culmination of his frustration about Buscaino trying to advance in the kitchen as a woman. (Buscaino Tr. 145:23-148:22; Buscaino Decl. []).

131.   Buscaino immediately walked to Chef Steelman's office and reported Echevarria's behavior and stating that his mistreatment was motivated by gender bias. (Buscaino Tr. 145:23-148:22; Buscaino Decl. []).

132.   Chef Steelman told Buscaino she could leave work early that night and that she could take the following day off with pay. He added that he "saw this coming," and would look into what happened. (Buscaino Tr. 145:23-148:22, 175:6-176:24).

133.   Buscaino left Chef Steelman's office to go home, but when she walked by Echevarria on her way out, he threw a tray of lamb past her onto a table in a very threatening manner while he screamed more profanities and more criticism at her. (Buscaino Tr. 145:23-148:22).

134.   Buscaino left the restaurant and called her father to tell him about what occurred. (Buscaino Tr. 199:23-200:8; Anthony Buscaino Tr. 21:10-25).

135.   After speaking with Buscaino, Anthony Buscaino, Buscaino's father called Steelman to find out what happened with his daughter that evening. (Anthony Buscaino Tr. 24:22-26:12).

136.     Anthony Buscaino had a longstanding acquaintanceship with Chef Steelman after years of patronizing The River Café as a customer. (Anthony Buscaino Tr. 15:12-18).

137.     Anthony Buscaino never threatened Chef Steelman. (Anthony Buscaino Tr. 25:13-26:12).

138.     Chef Steelman told Anthony Buscaino that he would take care of everything and make it right. (Anthony Buscaino Tr. 24:22-26:12).

139.     Buscaino texted Chef Steelman the following morning to let him know that she would not work her shift the following night, but that she had come in the morning to prep her station so others would not have to pick up her work. (Text with Steelman, P026-P028).

140.     Chef Steelman did not respond to Buscaino and did not let her know that he had a problem with her coming in that morning. (Text with Steelman, P026-P028).

141.     On December 19, 2021, almost immediately after Buscaino complained about sexual harassment for the first time, Stamford and Chef Steelman spoke about what happened and decided to terminate Plaintiff. (Stamford Tr. 45:17-24).

142.     Defendants did not investigate Buscaino's claim of gender discrimination. (Steelman Tr. 87:21-23; Stamford 54:16-25).

143.     Defendants did not tell Buscaino that she was terminated for any performance reason. (Buscaino Tr. 202:9-23).

Dated: New York, New York
        May __, 2024

By: */s/ Leah Seliger*

24

D. Maimon Kirschenbaum
Leah Seliger
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY 10004
T: 212-688-5640
F: 212-981-9587

*Attorneys for Plaintiff*