UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                             :

**DANIELLE BUSCAINO**,              :

               Plaintiff,       :

                            :   **MEMORANDUM DECISION AND ORDER**

        – against –           :

                            :   22-CV-7572 (AMD) (PK)

**DIRCKSEN & TALLEYRAND, INC.** and
**ARIEL ECHEVARRIA**,             :

               Defendants.     :

------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this action against Dircksen & Talleyrand, Inc., her former employer,

and Ariel Echevarria, her former co-worker, seeking damages under Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law,

N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law,

N.Y.C. Admin. Code §§ 8-107 *et seq.* ("NYCHRL").  The plaintiff makes hostile work

environment and retaliation claims.  Before the Court is the defendants' motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the

defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

The plaintiff graduated from the Culinary Institute of America in 2017 and worked as a

line cook in an Italian restaurant until August 2019, when she started working as a line cook at

---

[1] Unless otherwise noted, the factual background is based on the Court's review of the entire record,
including the parties' 56.1 statements.  The Court construes the facts in the light most favorable to the
plaintiff, the non-moving party.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir.
2015).  The Court does not consider the plaintiff's journal entries (ECF No. 47-1), which are hearsay to
which no exception applies.  *See Hudson v. Fischer*, No. 06-CV-1534, 2008 WL 5110974, at *9
(N.D.N.Y. Dec. 2, 2008) (declining to consider "151 page handwritten 'log book'" on a motion for

the River Café, an "elegant fine dining restaurant" in Brooklyn, New York. (ECF No. 40, Defendants' Rule 56.1 Statement ("Defs. 56.1") ¶ 1; ECF No. 46, Plaintiff's Rule 56.1 Counterstatement ("Pl. 56.1") ¶¶ 1, 99, 104); ECF No. 53, Defendants' Reply to Plaintiff's Rule 56.1 Counterstatement ("Defs. Reply") 56.1 ¶¶ 99, 104.) She was terminated in December 2021. (Defs. 56.1 ¶ 78; Pl. 56.1 ¶ 78.)[2]

## I.    The River Café's Hierarchy

Scott Stamford was the general manager of the River Café for 23 years. (Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)[3] He was responsible for overseeing the restaurant's daily operations, except for the kitchen. (Defs. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) There was a "hierarchy" in the River Café kitchen: the executive chef, the sous chef, line cooks, and prep staff. (Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 17.) In 2024, Brad Steelman, the executive chef for 24 years, was responsible for, "among other things, menu creation, execution of service, overseeing ordering, and supervising the kitchen staff." (Defs. 56.1 ¶¶ 6–7; Pl. 56.1 ¶¶ 6–7.)

Ariel Echevarria, a sous chef at the River Café for more than 17 years (Defs. 56.1 ¶ 10; Pl. 56.1 ¶ 10), had a supervisory role in the kitchen (Pl. 56.1 ¶ 14), and guided the line cooks in cooking, food preparation, and station cleanliness (Defs. 56.1 ¶ 13; Pl. 56.1 ¶ 13).[4] He was also responsible for "butchering meat, making sauces, expediting service, and ensuring that food

---

summary judgment "in which Plaintiff purportedly recorded the events" during which her coworkers created a hostile work environment and finding the log book constituted hearsay and that "Plaintiff does not offer an exception to the hearsay rule").

[2] The River Café was closed from March 2020 to December 2020 because of the COVID-19 pandemic, so the plaintiff did not work during that period. (Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)

[3] Stamford retired on October 13, 2023. (Defs. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)

[4] The defendants maintain that "[o]nly the Executive Chef supervises the line cooks." (Defs. 56.1 ¶ 14.) However, Steelman testified that Echevarria had an official supervisory role. (*See* Steelman Dep. 35:02-09 ("Q. Does [Echevarria] officially supervise[] anyone? A. Yes. Everyone basically. If he sees something that's not getting — a person is not cutting something right or doing something right, he will step over and say no, no. . . . He is just constantly overseeing the entire kitchen as well as I do.").)

items are stored properly in . . . the kitchen" (Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 11), as well as for ensuring that the food met the restaurant's quality and preparation standards (Defs. 56.1 ¶ 12; Pl. 56.1 ¶ 12).

Steelman interviewed the plaintiff and decided to hire her.  (Defs. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31.)  Echevarria did not participate in the interview and was not involved in the hiring decision.  (Defs. 56.1 ¶ 32; Pl. 56.1 ¶ 32.)  Steelman, not Echevarria, was the plaintiff's direct supervisor.  (Defs. 56.1 ¶¶ 14, 15; Pl. 56.1 ¶¶ 14, 15; *see, e.g.*, ECF No. 42-3, Deposition Transcript of Danielle Buscaino ("Buscaino Dep.") 95:10-14 (Q. Did you ever talk to Ariel [Echevarria] about the fact that you wanted a promotion in the kitchen?  A.  No because he is not my direct supervisor.").)

Echevarria was not responsible for hiring, firing, disciplining, or promoting employees, although the plaintiff says that Steelman consulted him, Stamford, and restaurant owner Buzzy O'Keefe about some decisions.  (Defs. 56.1 ¶ 15; Pl. 56.1 ¶ 15; *see, e.g.*, Buscaino Dep. 92:20–93:06 ("A.  I asked if [Steelman] could see myself as becoming the junior sous chef . . . he would, for now, be able to give me a raise until he talked to the hierarchy, as in Scott [Stamford] and Ariel [Echevarria] and Buzzy [O'Keefe], and make sure everyone was onboard with it before moving forward . . . .").)

## II.    The Plaintiff's Assignment and Job Performance

The plaintiff was first assigned to the Garde Manger station and reassigned to the hot appetizers station two months later.  (Defs. 56.1 ¶¶ 33–34; Pl. 56.1 ¶¶ 33–34.)  At that point, there were two line cooks on the Garde Manger station, one on the hot appetizer station, one on the grill station, one on the fish station, and one on the amuse-bouche station.  (Defs. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

The restaurant closed from March to December 2020 because of the COVID-19 pandemic.  (Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)  When the restaurant reopened, the plaintiff was assigned to the grill station.  (Defs. 56.1 ¶ 22; Pl. 56.1 ¶ 22)[5]  Steelman showed the plaintiff how to grill properly.  (Defs. 56.1 ¶ 40; Pl. 56.1 ¶ 40.)[6]  The plaintiff was "responsible for cooking meat to the desired/necessary temperature, portioning steaks,[] seasoning and rendering meat prior to service" (Defs. 56.1 ¶ 37; Pl. 56.1 ¶ 37), as well as "properly wrapping and storing raw meat in the walk-in refrigerator" (Defs. 56.1 ¶ 38; Pl. 56.1 ¶ 38).  All line cooks were required to clean their stations at the end of each meal service.  (Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 23.)

The plaintiff received four raises while she worked at the River Café, and Steelman and Echevarria frequently complimented her work.  (Pl. 56.1 ¶ 114–15; Defs. Reply 56.1 ¶ 114–15; *see* Buscaino Dep. 92:20–93:02 ("A. I asked if [Steelman] could see myself as becoming the junior sous chef position . . . he said absolutely.  I could see you in that position.  You've been doing real well.  Giving me a lot of compliments about my work ethic . . . ."); Buscaino Dep. 139:03-05 ("A: . . . previous to th[e] conversation [about the junior sous chef position, Echevarria] would always give me compliments and tell me I was doing well in my work.").)[7]  The plaintiff was never disciplined in writing for poor job performance.  (Pl. 56.1 ¶ 98; Defs. Reply 56.1 ¶ 98.)

---

[5] The Court does not consider the plaintiff's assertion, which the defendants dispute, that "[t]he grill station is considered the highest level among line cooks because it handles the most expensive ingredients — meat and poultry — and involves the highest level of skill" (Pl 56.1 ¶ 112), because she does not cite anything in the record to support her claim.

[6] The defendants state that the plaintiff was not receptive to Steelman's feedback, which the plaintiff denies. (Defs. 56.1 ¶ 40; Pl. 56.1 ¶ 40.)

[7] The defendants argue that the plaintiff's testimony does not support the conclusion that she "received *many* compliments" and is immaterial.  (Defs. Reply 56.1 ¶ 115 (emphasis in original).)

### III.    Echevarria's Comments About the Plaintiff's Physical Appearance

The plaintiff believed that Echevarria treated her differently because she was a woman. (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.)  He often commented on her physical appearance because of her gender.  (Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80.)[8]  For example, Echevarria told her she "clean[ed] up nice" and "look[ed] good" when she wore "normal clothes" for a friend's bridal shower.  (Defs. 56.1 ¶ 80; Pl. 56.1 ¶ 80; Buscaino Dep. 133:04-13.)  He also told her that her eyelashes were pretty.  (Defs. 56.1 ¶ 81; Pl. 56.1 ¶ 81.)  Another time, he said that "since [she] was pretty [she] didn't have to do much" because "someone would take care of things."  (Defs. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)  Echevarria did not comment on the physical appearances of the men in the kitchen.  (ECF No. 48, Danielle Buscaino's Declaration ("Buscaino Decl.") ¶ 13.)  Nor did he say anything inappropriate to other women in the kitchen.  (Defs. 56.1 ¶ 83; Pl. 56.1 ¶ 83.)

The plaintiff believed that "it's not really appropriate to be commenting on [the way someone looks] . . . at the work place."  (Pl. 56.1 ¶ 118; Buscaino Dep. 133:18-23.)  Echeverria's remarks were especially inappropriate because he was "a much older" married man "in a superior position."  (Pl. 56.1 ¶ 118; Buscaino Dep. 133:18-23.)  The plaintiff's only reaction to his comments was to say, "[O]h, that's kind of weird;" she did not say or do anything else because "he [wa]s [her] superior" (Pl. 56.1 ¶ 119; Buscaino Dep. 134:03-08), nor did she tell Steelman what Echevarria said (Defs. 56.1 ¶ 96; Pl. 56.1 ¶ 96).  None of the other line cooks or kitchen employees behaved in a discriminatory way (Defs. 56.1 ¶ 84; Pl. 56.1 ¶ 84), although O'Keefe talked to the hostesses about their short skirts, low-cut shirts, and high heels (Pl. 56.1 ¶ 122; Buscaino Dep. 215:22–216:05).[9]  Because of this behavior, the plaintiff "did not believe

---

[8] The plaintiff does not say when Echevarria commented about her looks.

[9] The defendants argue that this testimony is immaterial and prejudicial.  (Defs. Reply 56.1 ¶ 122.)

that management would respond positively to [her] reporting sexual harassment." (Pl. 56.1 ¶ 121; Buscaino Decl. ¶ 15.)

**IV.    August 2021: Conversation About the Junior Sous Chef Position**

In August 2021, the plaintiff told Steelman that she was interested in becoming a Junior Sous Chef. (Pl. 56.1 ¶ 130; Buscaino Dep. 92:04-09.)[10]  Steelman told her that to advance, she had to learn the workings of the entire kitchen, including the pastry department. (Defs. 56.1 ¶ 49; Pl. 56.1 ¶ 49.)  He encouraged her and other line cooks to work with the pastry chef. (Defs. 56.1 ¶ 50; Pl. 56.1 ¶ 50.)  At his deposition, Steelman did not recall whether he spoke to the plaintiff about her interest in advancement but he testified that there was no junior sous chef position. (Defs. Reply 56.1 ¶ 49; *see* ECF No. 42-2, Deposition Transcript of Brad Steelman ("Steelman Dep.") 63:16-22 ("Q. Do you deny that [the plaintiff] asked you to be a sous-chef maybe at a junior level to Ariel?  A. Well, there is no junior sous-chef position ever in this restaurant.  I don't know.  I don't really recall specifically actually.  You're asking for a position — it wasn't a position."); *id.* 62:15-22 ("A. I think the way I worded [it] may have been in order to be advanced in the industry, you need to know everything pastry. . . . I wasn't exactly saying in this restaurant you need to learn our pastry department."); *id.* 71:14-16 ("Q. Did you ever discuss Danielle's desire to promote with her? A. No.").)

Timothy Durkos was the sous chef at the River Café's sister restaurant, Plums, between July 2018 to April 2019, and moved to the River Café when Plums closed down in 2019. (Defs. 56.1 ¶¶ 24–25; Pl. 56.1 ¶¶ 24–25.)  According to the plaintiff, Durkos became the junior sous chef at the River Cafe until he left in 2020. (Pl. 56.1 ¶¶ 124–28.)  The plaintiff testified that

---

[10] Citing Steelman's testimony that "there was no [Junior Sous Chef] position available," the defendants contend that the plaintiff's claim is "unsupported and immaterial." (Defs. 56.1 ¶¶ 49, 130; Steelman Dep. 63:23–64:6.)  Steelman testified that he never spoke with the plaintiff about her desire for a promotion.  (Steelman Dep. ("Q. Did you ever discuss Danielle's desire to promote with her?  A. No.").)

Durkos was introduced to the line cooks as "the junior sous chef who would be joining . . . from their location across the street." (Pl. 56.1 ¶ 125; Buscaino Dep. 51:08-14.) The defendants, on the other hand, say Durkos was not a "junior sous chef," and that there was no such job when the plaintiff worked there. (Defs. 56.1 ¶ 27.) Durkos kept the sous chef title for payroll purposes when he was transferred to the River Café, even though "he was joining the kitchen staff there with the responsibilities of a line cook." (Defs. 56.1 ¶ 26.)[11]

When Echevarria learned that the plaintiff wanted to be the junior sous chef, he said, "[O]h, you're looking to move up." (Pl. 56.1 ¶ 134.)[12] Then, he started criticizing her. For example, he told her that she did not clean her station fast enough, but did not criticize the male workers. (Pl. 56.1 ¶ 135; Defs. 56.1 ¶ 135.) He let the male line cooks talk while they worked, but did not permit Buscaino to do so. (Pl. 56.1 ¶ 136.)

The defendants claim that the plaintiff's work was substandard; she "regularly undercooked meat, resulting in customers sending plates back to the kitchen," and consistently failed to respond to the chef's call back orders from, which frustrated the kitchen staff." (*See, e.g.*, Def. 56.1 ¶¶ 39–47.) The plaintiff testified that she may have cooked the meat incorrectly once or twice, but that customers rarely sent meat back to the kitchen. (Pl. 56.1 ¶ 39.) Sometimes, patrons were wrong about the way the meat was cooked. (*See* Defs. 56.1 ¶ 39; Pl. 56.1 ¶ 39.) The plaintiff denied failing to respond to the call back orders. (Pl. 56.1 ¶ 42.) Echevarria testified that "[a] little after [the plaintiff] moved to the grill station[,]" he told her that she could not "be texting or be on the phone" and that "[h]er disappearing towards the end of the service turned out to be enough to create chaos[.]" (Defs. 56.1 ¶ 44; ECF No. 42-4,

---

[11] The plaintiff denies this but does not cite any record evidence to the contrary. (Pl. 56.1 ¶ 26; Defs. Reply 56.1 ¶ 26.)

[12] The defendants say that Echevarria's statement is "immaterial." (Defs. Reply 56.1 ¶ 134.)

Deposition Transcript of Ariel Echevarria ("Echevarria Dep.") 26:13-17.)  Steelman testified that

two line cooks were upset because the plaintiff was not breaking down and scrubbing her station,

and that they were "looking at [Steelman] over a couple — over a span of days or weeks" to see

if he was going to intervene.  (Defs. 56.1 ¶ 46; Steelman Dep. 78:23–79:12.)

## V.    December 17, 2021: Incident in the Kitchen

The parties dispute what happened on December 17, 2021.  According to the plaintiff,

she was closing down the grill station and left to put away her tools.  (Pl. 56.1 ¶ 139; Defs. Reply

56.1 ¶ 139.)  When she returned to her station, Echevarria yelled and "curs[ed] at her, spitting,

and telling her that she's not better than anyone else and that she doesn't 'fucking do anything.'"

(Pl. 56.1 ¶ 140; Defs. Reply 56.1 ¶ 140.)[13]

Echevarria testified that the plaintiff left the kitchen.  (Defs. 56.1 ¶ 54.)  When she

returned, Echevarria told her to clean up the grill station.  (*Id.* ¶ 55.)  According to Echevarria,

the plaintiff "just snapped at me and started yelling[,] 'oh, I cleaned up,' really loudly. . . . [S]he

just started yelling at me just because I asked her to clean up."  (*Id.*; Echevarria Dep. 43:17-21.)

He raised his voice "to [get] across the with th[e] message" and told her that the other line cooks

were cleaning her station for her.  (Defs. 56.1 ¶ 57; Echevarria Dep. 44:09-11.)

At that point, the plaintiff went to Steelman's office.  (Defs. 56.1 ¶ 58; Pl. 56.1 ¶ 58.)

She told him what had just happened, and that Echevarria yelled at her "because [the plaintiff is]

a woman trying to come up."  (Pl. 56.1 ¶ 142; Buscaino Dep. 221:24–222:05.)  Steelman

responded that he "saw this coming" and told her to take off the rest of the day, and the

following day with pay.  (Pl. 56.1 ¶ 143–44; Steelman Dep. 176:13-16.)

---

[13] The defendants do not deny the plaintiff's recollection of the incident with Echevarria, but argue that these statements are immaterial to the plaintiff's claims.  (Defs. Reply 56.1 ¶¶ 139–140, 145.)  The plaintiff generally disputes the defendants' description of what happened between her and Echevarria. (*See, e.g.*, Pl. 56.1 ¶¶ 54–57, 63–64.)

Steelman, on the other hand, testified that the plaintiff "was visibly angry and kind of out of control. . . . She was kind of screaming and talking fast."  (Defs. 56.1 ¶ 59; Steelman Dep. 74:24–75:02.)  He "couldn't really make out" what she was saying, but "[s]he was talking about something about [Echevarria]."  (Defs. 56.1 ¶ 59; Steelman Dep. 75:03-06.)  He did say that he "saw this coming for awhile," but was referring to "the line cooks . . . getting upset that she wasn't doing her part at the end of her night."  (Steelman Dep. 78:20–79:02.)  He did not recall the plaintiff saying that Echevarria was treating her badly because she was a woman.  (Defs. 56.1 ¶ 61; Steelman Dep. 82:14-17.)  Steelman did not send the plaintiff home for the rest of the day.  Rather, he "sent her back out to the kitchen and told her to cool off.  If she had things to do she certainly could have done them."  (Steelman Dep. 76:16-18.)

The plaintiff claims that she returned to the kitchen, and Echevarria "yanked out the sheet tray with the lamb on it, flung it right in [her] face;" she thought he that he was going to throw it directly at her, but he "[c]hucked it onto a prep table by the walk-in."  (Pl. 56.1 ¶ 145; Buscaino Dep. 145:23–148:22.)  He said, "I'll just F'ing do all your work for you because you're not going to do it." (Buscaino Dep. 148:09-11.)  According to Echevarria, the plaintiff walked in front of him as he was pulling a tray of lamb out of the blast chiller.  (Defs. 56.1 ¶ 63; Echevarria Dep. 47:07-13.)  He showed her that she did not properly cover and store the lamb, which was one of her jobs as a grill station line cook.  (Defs. 56.1 ¶ 63; Echevarria Dep. 47:07-13.)  He then "turn[ed] around, put it on the table, [and] wrap[ped] it up."  (*Id.*; Echevarria Dep. 47:13-14.)

The plaintiff left the restaurant and called her father, Anthony Buscaino, and told him what happened.  (Pl. 56.1 ¶ 146.)  He called Steelman, who said that he would look into it.  (*Id.* ¶ 150.)[14]  Mr. Buscaino did not say that the plaintiff believed Echevarria's behavior was because

---

[14] The plaintiff alleges that Steelman said he "would take care of everything and make it right" (Pl. 56.1 ¶ 150), but the cited portion of the transcript does not support this statement.  (*See* ECF No. 42-4,

of her gender.  (Defs. 56.1 ¶ 68.)  According to Steelman, the plaintiff's father said, "If you don't do something, I'm going to come down there and do something," which Steelman thought was a threat.  (Defs. 56.1 ¶ 67; Steelman Dep. 83:13-15.)

At 12:16 a.m., the plaintiff sent Steelman the following text message:

> Chef I will not be coming tomorrow like you suggested.  After being cursed at, threaten[ed], spit on by screaming in my face, was told I was nothing and not above anyone here by Ariel.  Then had my lamb thrown across the room in such a threa[ten]ing manner.  I would hope you will be having an extensive discuss[ion] with Ariel about tonight's events.    That was beyond unprofessional and not acceptable.    He has created a hostile[,] threatening work environment.    As you said you knew this was coming after our discussion of a possible jr sous chef position.  It has been weeks of harassment, which you also knew about the tension between Ariel and I.  Please let me know the steps that will be taken to correct the situation and make this a safe work environment.

(ECF No. 47-2, Dec. 18, 2021 Text Messages at 1.)  Steelman did not read the message until after the plaintiff was terminated.  (Steelman Dep. 95:08-13; 97:04-08.)

## VI.   Aftermath and Investigation of December 17, 2021 Incident

On December 18, 2021, the plaintiff came to work, and prepared the grill station for the line cook who would be covering for her.  (Pl. 56.1 ¶ 152; Defs. Reply 56.1 ¶ 152.)  She texted Steelman at 11:59 a.m. that she "appreciate[d] [him] giving [her] the day off with pay" and that she "came in early this morning to set up the grill station because [she] [is] a professional and ha[s] a responsibility to the River Café and to [him] as well."  (ECF No. 47-2, Dec. 18, 2021 Text Messages at 2; *see also* Pl. 56.1 ¶ 152; Defs. Reply 56.1 ¶ 152.)  She added that "she look[ed] forward to an expedited resolution to the situation" and "would like to come early

---

Deposition Transcript of Anthony Buscaino ("Anthony Buscaino Dep."), ECF No. 42-3, 26:07-12 ("A. . . . I said Brad, please do me a favor, find out what's going on in the kitchen.  I would appreciate your help.  And he said yes, sir, I'm sorry.  And that was the end of the conversation.").)

tomorrow as well and discuss that with [him]."  (ECF No. 47-2, Dec. 18, 2021 Text Messages at 2; *see also* Pl. 56.1 ¶ 152; Defs. Reply 56.1 ¶ 152.)

The plaintiff alleges that Stamford did not investigate the December 17, 2021 incident and that the River Café did not investigate her gender discrimination claim before she filed the complaint in this action.  (Pl. 56.1 ¶¶ 71, 78, 154.)[15]  Steelman testified that he did not speak to Echevarria or other staff on December 17, 2021.  (Steelman Dep. 77:22–78:02.)  The next day, he spoke with Stamford and Echevarria "to determine what happened and what was going on." (Steelman Dep. 77:16-18; *see also* Defs. 56.1 ¶ 70.)  Steelman also testified, however, that he did not speak to Echevarria about the incident until after the plaintiff filed this lawsuit.  (Steelman Dep. 87:21–88:16.)

On December 18th and 19th, Stamford spoke to employees, including Michael Peggins, Andrew Fowles, and Bernardo Cruz, who said they heard a woman screaming from the kitchen. (Defs. 56.1 ¶¶ 73–75; Pl. 56.1 ¶¶ 73–75; ECF No. 42-1, Deposition Transcript of Scott Stamford ("Stamford Dep.") 9:13-20; 42:12–43:11.)  According to Fowles, customers were in the dining area at the time.  (Defs. 56.1 ¶ 74; Pl. 56.1 ¶ 74.)  Neither Fowles or Cruz remembered if they spoke to any River Café managers before the summer of 2023.  (Pl. 56.1 ¶¶ 158–59.)

**VII.    December 20, 2021: Termination of the Plaintiff's Employment**

On December 19, 2021, Stamford and Chef Steelman decided to terminate the plaintiff's employment (Pl. 56.1 ¶ 155), a decision in which Echevarria was not involved (Defs. 56.1 ¶ 79; Pl. 56.1 ¶ 79).[16]

---

[15] The defendants note that the plaintiff did not report Echevarria's comments about her appearance to Steelman.  (Defs. Reply 56.1 ¶¶ 154, 96.)

[16] The Court does not consider Stamford's hearsay statement that Steelman told him that Echevarria "felt [the plaintiff] should be terminated."  (Defs. Reply 56.1 ¶ 160; Stamford Dep. 33:02-06.)  *See Debrosse v. City of New York*, 739 F. App'x 48, 50 (2d Cir. 2018) (finding deposition testimony, including the testimony of an eyewitness's father who "recount[ed] what his daughter told him" and the victim's

Steelman told Stamford that he "would like to let [the plaintiff] go and [Stamford] said ok." (Steelman Dep. 106:20-21.) Steelman testified that the plaintiff was fired because she "scream[ed] in the kitchen and then [came] to work the next day unsupervised." (Defs. 56.1 ¶ 78; Steelman Dep. 100:04-06.) He asked Stamford to advise the plaintiff of the termination because he "[did not] want to have any interaction with her father or anybody over there." (Steelman Dep. 106:21-24). Stamford agreed to make the call. (*Id.* 106:24.)

On December 20, 2021, Stamford called the plaintiff and notified her that she was being terminated. (Pl. 56.1 ¶ 156; Defs. 56.1 ¶ 156.) According to the plaintiff, Stamford told her that her account of the December 17th incident was inconsistent with what other employees, including Echevarria, said. (Pl. 56.1 ¶ 156; Buscaino Decl. ¶ 32; Buscaino Dep. 203:16-23.) He also said that she was insubordinate when she left early on December 17, 2021 without finishing her work. (Pl. 56.1 ¶ 156; Buscaino Decl. ¶ 32.) Stamford did not say that she was being fired for poor performance. (Pl. 56.1 ¶ 162; Defs. 56.1 ¶ 162.)

Stamford, on the other hand, testified that he told the plaintiff that "she did not perform her job [on the night of the incident] and that [Steelman] asked [him] to terminate her." (Stamford Dep. 24:19-21.) He explained that the decision was also "based on interviews with [Echevarria] and [Echevarria]'s interviews with people who worked alongside her elbow to elbow . . . and that [the plaintiff's] account, where she stated she did do her job, was not supported by the available evidence." (*Id*. 24:25–25:09.)

---

testimony "relaying [the eyewitness's] statements, including her statements about what the police told her," to be "inadmissible hearsay" and declining to consider it on a motion for summary judgment).

## LEGAL STANDARD

### I.  Summary Judgment

The defendants move for summary judgment on the plaintiff's Title VII and New York state and city claims for hostile work environment and retaliation under Federal Rule of Procedure 56.  (ECF No. 39.)[17]  The plaintiff opposes.

Summary judgment is warranted only if the submissions, including deposition transcripts, affidavits, or other documentation show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine" dispute arises when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under governing law" qualify as "material," and "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id.*  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Strass v. Costco Wholesale Corp.*, No. 14-CV-6924, 2016 WL 3448578, at *2 (E.D.N.Y. June 17, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

---

[17] The defendants argue that the plaintiff has abandoned any traditional gender discrimination claim, to the extent that she meant to make one, because she did not address the defendants' arguments on this issue in her opposition.  (ECF No. 51 at 14; *see also* ECF No. 41 at 24 ("To establish a *prima facie* claim of discrimination under Title VII and the NYSHRL, a plaintiff must establish that: (i) she belongs to a protected class; (ii) she was qualified for her position; (iii) she was subjected to an adverse employment action; and (iv) the adverse action took place under circumstances that give rise to an inference of unlawful discrimination." (citing *Brown v. City of Syracuse,* 673 F.3d 141, 150 (2d Cir. 2012); *Mayorga v. Greenberg*, No. 22-CV-387, 2023 WL 6307994, at *6 (E.D.N.Y. Sept. 28, 2023))).)  The plaintiff has not raised a traditional gender discrimination claim, but even if she had, she has abandoned it.  (ECF Nos. 1, 34.)  *See, e.g.*, *Rubin v. Abbott Lab'ys*, No. 13-CV-8667, 2015 WL 5679644, at *7 (S.D.N.Y. Sept. 23, 2015) (granting motion for summary judgment on the plaintiff's "federal, state and city law claims for discrimination, retaliation, and constructive discharge" because she did not address the defendants' arguments as to these claims in her opposition, and, therefore, abandoned them); *Lami v. Stahl*, No. 05-CV-1416, 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned.").

A court determining whether there are genuine disputes of material fact must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (cleaned up). The non-moving party will prevail "only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) ("Once the moving party has met [its] burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." (citing *Celotex*, 477 U.S. at 324)).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). Given the "'elusive nature of intentional discrimination,' plaintiffs must often 'rely on bits and pieces of information to support an inference of discrimination.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (cleaned up) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015)). Accordingly, "[b]ecause of the likelihood that 'direct

evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (cleaned up) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "The resulting 'mosaic of intentional discrimination' may be sufficient to show discrimination." *Id.* (cleaned up) (quoting *Vega*, 801 F.3d at 86). "Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment." *Id.* (citing *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 92 (2d Cir. 1996)).

## DISCUSSION

### I. Title VII Claim for Hostile Work Environment

A plaintiff claiming hostile work environment under Title VII must produce evidence that (1) "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), and (2) "a specific basis exists for imputing the objectionable conduct to the employer," *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). "Isolated, minor acts or occasional episodes do not warrant relief . . . a plaintiff must still prove that the incidents were sufficiently continuous and concerted to be considered pervasive, or that a single episode is severe enough to establish a hostile working environment." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (cleaned up). Courts evaluating hostile work environment claims consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Patterson v. Oneida County, NY*, 375 F.3d 206, 227 (2d Cir. 2004) (citation omitted).

A work environment is hostile if "a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan*, 192 F.3d at 318 (citation omitted). It is "'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." *Alfano*, 294 F.3d at 374 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)). "Favorable or equitable treatment of a protected group as a whole does not preclude a Title VII claim by a member of that group." *Goffe v. NYU Hosp. Ctr.*, 201 F. Supp. 3d 337, 349 (E.D.N.Y. Aug. 22, 2016); *see Connecticut v. Teal*, 457 U.S. 440, 454–55 (1982) ("Under Title VII, a racially balanced work force cannot immunize an employer from liability for specific acts of discrimination. . . . It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." (citations omitted)).

There are two "specific bas[es] for imputing the conduct creating the hostile work environment to the employer:" "negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it," and "strict vicarious liability if an employer's supervisor has created the hostile environment." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (citations omitted). If the supervisor's harassment does not result in a "tangible employment action," the employer has an "affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). To prevail on the affirmative defense — the

"*Ellerth/Faragher* defense" — the employer must establish that (a) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (b) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *see also Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d Cir. 2015). "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action . . . ." *Ellerth*, 524 U.S. at 765.

The defendants argue that Echevarria's comments about the plaintiff's appearance are innocuous, that his criticism of her work performance is not actionable, and the plaintiff has not cited evidence that Echevarria was motivated by gender discrimination. (ECF No. 41 at 18–23.)

### a.     Severe and Pervasive

The plaintiff's evidence is sufficient to raise a genuine dispute of material fact about the existence and pervasiveness of Echevarria's alleged harassment. The plaintiff testified that Echevarria commented on her physical appearance on multiple occasions, and that she was uncomfortable because he was "a much older man who is married" and "in a superior position," and that it was "not really appropriate to be commenting on [her looks] . . . at the work place." (Pl. 56.1 ¶ 118–19; Buscaino Dep. 133:18-23.) For example, Echevarria told her that "since [she] was pretty [she] didn't have to do much" and that "someone would take care of things." (Defs. 56.1 ¶ 82; Pl. 56.1 ¶ 82.) He also remarked about the way she was dressed. (Defs. 56.1 ¶ 80; Pl. 56.1 ¶ 80; Buscaino Dep. 133:04-13.)

After the plaintiff spoke to Steelman about becoming a junior sous chef, Echevarria started criticizing her, including in the kitchen, where other staff could hear. He said, "[O]h, you are looking to move up." (Pl. 56.1 ¶ 134; Buscaino Dep. 101:17-18.) According to the plaintiff,

Echevarria yelled at her on December 17, 2021 and "curs[ed] at her, spit[], and t[old] her that she's not better than anyone else and that she doesn't 'fucking do anything.'"  (Pl. 56.1 ¶ 140; Defs. Reply 56.1 ¶ 140.)  Later that day, the plaintiff texted Steelman that Echevarria had subjected her to "weeks of harassment" and "created a hostile[,] threatening work environment." (ECF No. 47-2, Dec. 18, 2021 Text Messages at 1.)  She also said that Echevarria threw lamb from "across the room," which was threatening.  (*Id.*)

To be sure, the defendants dispute the credibility of the plaintiff's claims and proffer different versions of the events in question.  But these are classic disputes of material fact.  "To the extent that the defendants contend that [the plaintiff's] testimony should not be believed, her credibility must be tested at trial."  *Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, No. 18-CV-6836, 2021 WL 6064520, at *3 (S.D.N.Y. Dec. 22, 2021), *aff'd sub nom. Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115 (2d Cir. 2024); *see also Hayut v. State Univ. of N.Y.*, 352 F.3d 733,745–46 (2d Cir. 2003) (finding the plaintiff's testimony sufficient to survive summary judgment on the question whether the work environment was subjectively hostile). The plaintiff's evidence, which the Court views in the light most favorable to her, is sufficient to raise triable issues about whether she was subjected to a hostile work environment.

### b.    Harassment "Because of" Gender

The parties agree that Echevarria's comments about the plaintiff's physical appearance were gender based.  The defendants contend, however, that Echevarria's criticism after the plaintiff's conversation with Steelman about a promotion was not "because of" her gender. (ECF No. 41 at 22–23.)

In determining whether the plaintiff has "establish[ed] that the abuse was based on her gender," courts can consider "[f]acially neutral incidents . . . among the 'totality of the

circumstances' . . . so long as a reasonable fact-finder could conclude that they were, in fact, based on sex." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). Because this inquiry "often requires an assessment of individuals' motivations and state of mind," "the court should not view the record in piecemeal fashion," and "summary judgment should be used sparingly." *Id.* at 548.

The plaintiff claims that Echevarria often made comments about her appearance, and that he did not make similar comments to the men who worked in the kitchen. (Buscaino Decl. ¶¶ 11, 13; *see also* Buscaino Dep. 137:10-16 ("Q. Did you ever hear [Echevarria] say anything you considered to be inappropriate to another man in the kitchen? A. Not really. I tried not to listen in to his conversations like that.").) *See Hayut*, 352 F.3d at 748 (finding sufficient evidence that professor's harassment was based on student's gender where the comments were "not likely to have been uttered but for" plaintiff's gender). After the plaintiff talked to Steelman about a promotion, Echevarria started criticizing her for things like texting and talking on her phone, but did not criticize the male employees for the same behavior. (Pl. 56.1 ¶ 135; Defs. 56.1 ¶ 135.) *See, e.g.*, *DeAngelis v. City of Bridgeport*, No. 14-CV-01618 , 2017 WL 3880762, at *7 (D. Conn. Sept. 5, 2017) (denying summary judgment on gender-based hostile work environment claim where testimony that "supervisors behaved in a verbally abusive, hostile manner toward women and not toward men could allow a reasonable jury to conclude that plaintiff was exposed to the hostile work environment she describes because of her gender."). Echevarria "yelled at and scolded [the plaintiff] to not be talking on the line" (Buscaino Dep. at 138:12-18) but did not criticize the male line cooks when they did the same thing (*id.* 143:10-

25).[18]  Under these circumstances, there is a genuine issue of material fact about whether Echevarria criticized and harassed the plaintiff because of her gender.

### c.    Whether Echevarria Was a Supervisory Employee

A "supervisor" is someone who "is empowered by the employer to take tangible employment actions against the victim."  *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013).  A "tangible employment action" means a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* at 431 (citing *Ellerth*, 524 U.S. at 761).  "The hallmark of the tangible employment action thus used to identify a supervisor is its potential 'to inflict direct economic injury.'"  *Bentley*, 935 F.3d at 91 (quoting *Vance*, 570 U.S. at 440).  Therefore, to raise a triable issue of fact that Echevarria was a supervisor, the plaintiff must show that the River Café authorized Echevarria to "do more than oversee her day-to-day performance of assigned tasks.  It had to have authorized [Echevarria] to take tangible employment actions that could inflict direct economic injury."  *Id.* (emphasis in the original).  The plaintiff has not met this burden.

The defendants claim that Echevarria did not have the authority to hire, fire, promote, or reassign any employees at the River Café.  (ECF No. 41 at 15–17; Defs. 56.1 ¶ 15.)  In response, the plaintiff cites her testimony that Echevarria supervised her work, and her claim that Steelman referred to Echevarria as a supervisor.  (ECF 45 at 25–26; Pl. 56.1 ¶ 15.)  She testified that Steelman said that he had to talk to "the hierarchy, as in Scott and Ariel [Echevarria] and Buzzy, and make sure everyone was onboard with it before moving forward[]" with a raise.  (Buscaino Dep. 92:25–93:06.)  But this testimony does not establish that Echevarria was a supervisor.

---

[18] The plaintiff testified that Echevarria criticized her for not cleaning fast enough, but did not say whether the male employees escaped similar criticism.  (*See, e.g.*, Buscaino Dep. 69:24–70:7; 76:9-17.)

"[A]t most, the evidence shows that [Echevarria] was able to offer verbal recommendations, when asked." *De Abreu v. Johnson Controls Fire Prot. LP*, No. 18-CV-2686, 2021 WL 4409716, at *12 (E.D.N.Y. Sept. 27, 2021) (finding no supervisory authority for the purposes of a Title VII claim where high-level salesman testified "regarding promotions in the Hauppauge office" and that '[i]f I was asked a question if someone was doing a good job, I would answer yes or no.  But I never gave a written recommendation, no.'").  Echevarria did not make the plaintiff's schedule or control any aspects of her work in a way that could cause direct economic injury.  *See Bentley*, 935 F.3d at 91 ("[T]he ability to direct another employee's tasks is simply not sufficient to make one a supervisor." (quoting *Vance*, 570 U.S. at 439) (internal quotations omitted)).  Accordingly, the plaintiff has not established that Echevarria was a supervisor.

### d.      Dircksen & Talleyrand's Liability for Echevarria's Conduct

Because Echevarria was not a supervisor, Dircksen & Talleyrand is liable for Echevarria's conduct if: (1) "it failed to provide a reasonable avenue for complaint," or (2) "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Legg v. Ulster Cty.*, 979 F.3d 101, 115 (2d Cir. 2020) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).

Evidence that Dircksen & Talleyrand "did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed" is relevant in determining whether it was negligent.  *Vance*, 570 U.S. at 448–49.  "Whether the company's response was reasonable has to be assessed from the totality of circumstances.  Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998).

The defendants argue that the plaintiff did not report Echeverria's comments about her appearance, and thus has not shown that the River Café knew or should have known the comments. (ECF No. 41 at 17.) The plaintiff responds that she "complained to Steelman about Echevarria's comment on December 17, telling him that Echevarria's conduct towards her was 'because she [was] a woman trying to come up,' and had been 'happening for weeks' ever since she 'brought up the junior sous chef position.'" (ECF No. 45 at 23–24 (quoting Buscaino Dep. 175:20-25, 221:19–222:05).)

The plaintiff has not raised a material issue of fact about whether Dircksen & Talleyrand provided a reasonable avenue for complaint. It is undisputed that Dircksen & Talleyrand had anti-sexual harassment and anti-discrimination policies and encouraged employees to report harassment or discrimination to their direct supervisors or the general manager. (Defs. 56.1 ¶¶ 28, 29; Pl. 56.1 ¶¶ 28, 29.) Moreover, the record shows that the plaintiff had a reasonable avenue for her complaint; she told Steelman about December 17, 2021 incident with Echevarria. *See McArdle v. Arms Acres, Inc.*, No. 03-CV-05721, 2009 WL 755287, at *8 (S.D.N.Y. Mar. 23, 2009) ("[E]ven where an employer has no formal sexual harassment policy, a court may still find, as a matter of law, that an employer provided a 'reasonable avenue of complaint' if the evidence shows that the plaintiff in fact knew how to make a complaint and that the complaint was adequately addressed.").

The plaintiff, has, however, raised a material issue of fact about whether Dircksen & Talleyrand was negligent in responding to her complaint. The plaintiff maintains that Steelman did not investigate her claim that Echevarria was hostile to her because she was "a woman trying to come up" (Pl. 56.1 ¶ 142), or her claims in a text message the next day that Echevarria "created a hostile[,] threatening work environment" and that his conduct on December 17, 2021

occurred "after [the] discussion of a possible jr sous chef position." (ECF No. 47-2, Dec. 18, 2021 Text Messages at 1.)

To establish a genuine issue of fact about whether Dircksen & Talleyrand was negligent in addressing the plaintiff's complaint, the plaintiff must show that: "(1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F. at 763 (emphasis in the original). "For non-supervisory coworkers who 'lack[ ] authority to counsel, investigate, suspend, or fire the accused harasser . . . the co-worker's inaction does not spark employer liability *unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions*.'" *Id.* (quoting *Torres v. Pisano*, 116 F.3d 625, 637 (2d Cir. 1997) (emphasis in the original)).

There is no evidence that the plaintiff ever made a formal complaint about Echevarria's behavior before December 17, 2021. (Defs. 56.1 ¶ 96; Pl. 56.1 ¶ 96.) Nor is there any evidence that Echevarria harassed or was inappropriate to other women. (Defs. 56.1 ¶ 83; Pl. 56.1 ¶ 83.) The issue is whether there is a genuine dispute about whether Dircksen & Talleyrand was negligent in addressing Echevarria's harassing conduct after the plaintiff reported his behavior to Steelman on December 17, 2021. The Court concludes that there is.

Steelman had actual knowledge of the plaintiff's claim because the plaintiff told him about it on December 17, 2021 and texted him about it the next day. (Pl. 56.1 ¶ 142.)[19] Steelman's knowledge can be imputed to Dircksen & Talleyrand, which the defendants do not dispute.

---

[19] Steelman testified that he did not recall the plaintiff attributing Echevarria's behavior to hostility toward her gender. (Defs. 56.1 ¶ 61; Steelman Dep. 82:14-17.)

While the record shows that the restaurant did look into the December 17th dispute, there is also "evidence in the record from which a reasonable jury could conclude that those actions were not sufficient in light of the circumstances." *Riggins v. Town of Berlin*, No. 23-CV-868, 2024 WL 2972896, at *3 (2d Cir. June 13, 2024). On December 18, 2021, the day after the argument, Steelman testified that he talked to Stamford and Echevarria "to determine what happened and what was going on." (Steelman Dep. 77:16-18; see also Defs. 56.1 ¶ 70.) Yet he also testified that he did not speak to Echevarria about the December 17th incident until the plaintiff filed this lawsuit. (Steelman Dep. 87:21–88:16.) Moreover, Steelman did not read the plaintiff's December 18th text message until after she was terminated. (Steelman Dep. 95:08-13; 97:04-08.) Nor did he tell Stamford that the plaintiff felt threatened by Echevarria or of her sense that Echeverria treated her differently because of her gender. (Stamford Dep. 43:22–44:09.) While Steelman delegated the investigation into the argument to Stamford, he did not know to what extent Stamford investigated the plaintiff's complaint. (Steelman Dep. 103:03-104:03 ("Q. Do you know anything at all about what he did to look into that incident? A. I do not").)

The defendants' motion for summary judgement is denied as to Dircksen & Talleyrand. However, a Title VII claim "may be brought only against the employing entity." *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). For that reason, the defendants' motion for summary judgment on the hostile work environment claims is granted as to Echevarria.

## II.  Title VII Claim for Retaliation

"The burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), governs retaliation claims under . . . Title VII." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (cleaned up). An employee claiming retaliation must show: "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the

employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). The plaintiff bears the "minimal" initial burden of establishing a retaliation claim. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125 (citation omitted). If the employer's burden is met, then "[t]he burden shifts . . . back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (citation omitted).

There is no dispute that the plaintiff's termination is a materially adverse action. The defendants contend that the plaintiff has not established that she was engaged in protected activity, that the employer was aware of that activity, or a causal connection between the protected activity and materially adverse action. (ECF No. 41 at 30–33.)

**a. Protected Activity & Employer's Awareness**

The defendants argue that the plaintiff's complaint about Echevarria to Steelman was not protected activity because it was "an expression of her perceived workplace difficulties." (ECF No. 41 at 31.)

"Complaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language." *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citation omitted). "However, ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Id.* (citation omitted). "[W]hile [an employee's] complaints [about discrimination] may be informal, they cannot be so vague or 'generalized' that the

employer could not 'reasonably have understood[ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)). "[W]here an employee claims gender-based discrimination, the employee's informal complaints to management must be gender-based, and not a general complaint about mistreatment by a supervisor or co-worker." *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *20 (E.D.N.Y. Sept. 24, 2014).

The plaintiff asserts that she was complaining about gender discrimination when she told Steelman that Echevarria was hostile to her because she was "a woman trying to come up." (Pl. 56.1 ¶ 142). Under these circumstances, the Court cannot conclude as a matter of law that Steelman "could not 'reasonably have understood [ ] that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Fraser v. MTA Long Island Rail Rd.*, 295 F. Supp. 3d 230, 272–73 (E.D.N.Y. 2018) (concluding that plaintiff engaged in protected activity based on her deposition testimony in which "she could only vaguely describe the substance of the conversation [with her superior], although she remembered complaining that 'everything' was 'shifting and changing,' and that the changes were occurring because she was a woman" (citations omitted)); *Setelius*, 2014 WL 4773975, at *21 (finding plaintiff's deposition testimony that she complained to her supervisor that a co-worker felt he "could yell at [her] because [she] was a woman" was sufficient to establish that her complaint was gender based and constituted protected activity). Accordingly, the plaintiff has sufficiently established that her complaint was protected activity.

### b. Causal Connection

The defendants assert that the plaintiff has not shown that she was terminated based on gender discrimination because "[i]t is undisputed that Chef Steelman made the decision to terminate Plaintiff's employment because of her inappropriate conduct in the kitchen on December 17 and her disregard of his instruction not to report to work." (ECF No. 41 at 33.)

For purposes of a retaliation claim, "causal connection" can be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (citation omitted). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted). The plaintiff was terminated three days after she complained to Steelman that Echevarria was criticizing her because of her gender (Pl. 56.1 ¶ 142), which is sufficient to establish the requisite causal connection. *See Austin v. Phone2Action, Inc*., No. 21-CV-491, 2023 WL 6201409, at *8 (E.D.N.Y. Sept. 22, 2023) (finding that the plaintiff established a causal connection where the plaintiff was terminated six days after she made a complaint).

### c. Legitimate, Non-Retaliatory Reason for Termination

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citation omitted). The defendants claim that the River Café had legitimate, non-retaliatory reasons for terminating the

27

plaintiff's employment: the plaintiff's behavior on December 17, 2021 was inappropriate and she

disobeyed Steelman's instruction to stay home the next day.  (ECF No. 41 at 28.)

A disagreement with a co-worker and insubordination are legitimate, nondiscriminatory

reasons for termination.  *See, e.g.*, *Gironda v. Shoreham-Wading River Cent. Sch. Dist*., No. 19-

CV-4301, 2023 WL 2710359, at *14 (E.D.N.Y. Mar. 30, 2023) (finding the defendants

established legitimate, nondiscriminatory reasons for the involuntary transfer of the plaintiff

because "Plaintiff could not get along with Carlson, her direct supervisor and the school

principal"); *Weiping Liu v. Indium Corp. of Am.*, No. 16-CV-1080, 2019 WL 3825511, at *17,

21 (N.D.N.Y. Aug. 15, 2019) (finding the defendants established legitimate, nondiscriminatory

reasons with evidence that the decision was based on the plaintiff's difficulty working with

others and insubordination); *Lai v. Delorio Foods, Inc*., No. 15-CV-0195, 2018 WL 987258, *6

(N.D.N.Y. Feb. 20, 2018) ("[A] profound inability to get along with . . . coworkers . . . represents

a legitimate nondiscriminatory reason for an employment decision." (citation omitted)).

Therefore, the defendants have met their burden of establishing legitimate, non-discriminatory

reasons for the plaintiff's termination.

### d.  Pretext

Having found that the defendants have established legitimate, non-retaliatory reasons for

the plaintiff's termination, the burden shifts to the plaintiff to show that the defendants' reasons

were pretextual.  *See Zann Kwan*, 737 F.3d at 845 ("Under the *McDonnell Douglas* framework,

after the defendant has articulated a non-retaliatory reason for the employment action . . . [t]he

plaintiff must then come forward with non-retaliatory reason is a mere pretext for retaliation."

(citation omitted)).  The plaintiff cites (1) Steelman's inconsistent reasons for the termination, (2)

Stamford's failure to investigate the December 17, 2021 incident before firing the plaintiff and

28

(3) the plaintiff's belief that Steelman gave her the option to stay home on December 18, 2021. (ECF No. 45 at 19–22.)  The defendants deny that Steelman's testimony was inconsistent with his declarations and say that Stamford investigated the December 17th incident on December 18th.  (ECF No. 51 at 13.)  They also contend that "the factual record is clear that Chef Steelman decided to terminate Plaintiff's employment because she engaged in inappropriate behavior and then was perceived to disobey his instruction to stay home the next day."  (*Id.*)

"[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Zann Kwan*, 737 F.3d at 847 (citation omitted).  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 846.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action."  *Id.*  "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Id.* (citations omitted.)  "Temporal proximity alone is insufficient to defeat summary judgment at [this] stage."  *Id.* at 847.

According to the plaintiff, the defendants' termination explanations were pretextual because Steelman was inconsistent in his statements about why the plaintiff was fired.  (ECF No. 45 at 19–22.)  The record supports the plaintiff's claim.  In a sworn declaration, Steelman said the following about Stamford's investigation into the December 17, 2021 incident:

> 21.  Scott Stamford ("Stamford"), the former General Manager of the River Café, investigated the December 17, 2021 incident and reported his findings to me.

22. Due to the results of Stamford's investigation, which confirmed Buscaino's inappropriate conduct in the kitchen on December 17, 2021, and her disregard of my instruction to stay home (with pay), I decided to terminate Buscaino's employment with the River Café.

(ECF No. 43, Brad Steelman's Declaration ("Aug. 8, 2024 Steelman Decl.") ¶¶ 21–22.).)

In a different sworn declaration, Steelman discussed his knowledge of Stamford's investigation:

7. Following the December 17, 2021 incident between Plaintiff Danielle Buscaino ("Buscaino") and Sous Chef Ariel Echevarria ("Echevarria"), I asked Scott Stamford ("Stamford"), the former General Manager of the River Café, to investigate what occurred.

8. The following day, on December 18, Stamford told me that he completed his investigation of the December 17, 2021 incident.

9. I asked Stamford if he spoke with members of the staff who were working on December 17. Stamford told me he spoke with staff who were in the dining room on December 17, who confirmed hearing a woman's voice screaming from the kitchen that evening.

10. I do not know if Stamford spoke with Echevarria as part of his investigation of the December 17 incident.

11. Due to the results of Stamford's investigation, which confirmed Buscaino's inappropriate conduct on December 17, 2021, and her disregard of my instruction to stay home (with pay) on December 18, 2021, I decided to terminate Buscaino's employment with the River Café.

(ECF No. 52, Brad Steelman's Declaration ("Oct. 20, 2024 Steelman Decl.") ¶¶ 7 – 11.)

Steelman's deposition testimony was different. He testified that the plaintiff was terminated for "[s]creaming in the kitchen and then coming to work the next day unsupervised." (Steelman Dep. 100:04-06.) He gave shifting and inconsistent descriptions about his December 18th conversation with Stamford and about Stamford's investigation into the December 17th events. For example, he testified that, after the plaintiff's father called him, "I kind of just decided — I wasn't looking at anything. I asked Scott to take over the next day and let him deal

with everything." (Steelman Dep. 95:20–25.) He said that he talked to Stamford and Echevarria

"to determine what happened and what was going on" (Steelman Dep. 77:16-18; *see also* Defs.

56.1 ¶ 70), but also said that he did not talk to Echevarria about the incident until after the

plaintiff filed this lawsuit (Steelman Dep. 87:21–88:16).

      Steelman also gave the following testimony about the investigation:

> Q. Do you know if Mr. Sta[m]ford did any sort of investigation into
> what happened that night?
> A. He may have spoken to Ariel [Echevarria]. I'm not sure.
> Q. Do you know if he spoke to any other kitchen staff about it?
> A. That would be a question for him.
> Q. Do you know if he spoke to any front of house staff?
> A. Again, that would be a question for him.
> . . .
> Q. Do you know anything at all about what he did to look into that
> incident?
> A. I do not.

(*Id.* 103:03-104:03.)

      The plaintiff has also "demonstrat[ed] weaknesses, implausibilities, inconsistencies, or

contradictions" in the defendants' second explanation — that the plaintiff came to work on

December 18, 2021 despite Steelman's instruction that she take the day off with pay. The

plaintiff states that Steelman's instruction to stay home was optional, not mandatory (Pl. Reply

56.1 ¶ 60), and cites her deposition testimony:

> Q. It's your testimony that [Steelman] did not give you instructions
> to not come in the next day?
> A. No, he never told me not to come in. He told me if I wanted to,
> I could take the next day off and go do Christmas shopping and have
> a relaxing day. He never told me that I was not physically allowed
> to work.

(Pl. Reply 56.1 ¶ 60; Buscaino Dep. 194:25–195:10; *see also* (Buscaino Dep. 163:25–164:

"A. . . . [Steelman] told me that if I wanted to and it was my choice, to take the next day and go

Christmas shopping for my family and have a relaxing day.  He did not tell me I had to leave.

He told me that I did have the option . . . .").)

> At his deposition, Steelman stated that his instruction to stay home was mandatory:

>> Q. Did you make it clear to Danielle that she was not to come to the restaurant the next day?
>> A. Yes, I did.
>> Q.  Do you remember the language you used?
>> A. Take the day off, cool off.  I will [g]ive you full pay and we will figure out what happened.

(Steelman Dep. 85:23–86:15.)[20]

Based on the discrepancies in Steelman's deposition testimony and declarations and the plaintiff's testimony about Steelman's statements on December 17th, a reasonable juror could conclude that his explanations for the termination decision were pretextual.  Thus, there are triable issues of fact about whether the defendants fired the plaintiff because she complained about Echevarria on December 17th.  *See Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) ("Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive."); *Privler v. CSX Transportation Inc.*, No. 118-CV-1020, 2021 WL 3603334, at *15 (N.D.N.Y. Aug. 13, 2021) (finding the plaintiff "presented just barely enough evidence of pretext to survive summary judgment" based on the defendant's shifting explanations for rejecting the plaintiff's job application); *Rosalie v. Supreme Glass Co.*, No. 18-CV-02064, 2020 WL 6263311, at *7 (E.D.N.Y. Oct. 23, 2020) (finding the defendant offered a "*post hoc* explanation for [the plaintiff's] dismissal" based on, among other evidence, the plaintiff's declaration that he was told he was fired because he failed to "include notes on various orders," the defendant's argument in support of its motion for summary judgment that the

---

[20] Steelman's statement in his declarations that the plaintiff disregarded his order to stay home on December 18th comports with his testimony.  (*See* ECF No. 43, Aug. 8, 2024 Steelman Decl. ¶ 22; ECF No. 52, Oct. 20, 2024 Steelman Decl." ¶ 11.)

plaintiff was fired because "multiple vendors and customers refused to work with him," and the

defendant's list of the customers who refused to work with him, which was created after the

lawsuit was filed).

As with the Title VII claim for hostile work environment, the summary judgment motion

must be granted on the Title VII claim for retaliation as to Echeverria because Title VII claims

are actionable only against the "employing entity." *Naumovski*, 934 F.3d at 212.

## III.   NYSHRL and NYCHRL Claims for Hostile Work Environment and Retaliation

### a.   Dircksen & Talleyrand's Liability

The NYSHRL and NYCHRL provide that "it shall be an unlawful discriminatory practice

for an employer "to discharge from employment such individual or to discriminate against such

individual in . . . terms, conditions[,] or privileges of employment" because of their gender or

creed, among other protected categories.  N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8-

107(1)(a), (3).

"As summary judgment must be denied under the stricter standards of Title VII, it is also

denied with respect to the NYCHRL [and NYSHRL]."  *Qorrolli*, 2021 WL 6064520, at *3; *see

also Chinchilla v. N.Y.C. Police Dep't*, No. 23-CV-8986, 2024 WL 3400526, at *7 (S.D.N.Y.

July 12, 2024) ("While courts in this Circuit have historically treated Title VII and NYSHRL

discrimination claims similarly, in 2019, the NYSHRL was amended to be 'closer to the standard

of the NYCHRL.'" (citation omitted)).  Accordingly, the defendants' motion for summary

judgment on the NYSHRL and NYSCHRL claims for hostile work environment and retaliation

are denied as to Dircksen & Talleyrand.

### b.  Aiding and Abetting Liability

The plaintiff alleges a NYSHRL claim for aiding and abetting against Dircksen &

Talleyrand, but not against Echevarria.  (ECF No. 1 ¶¶ 75–80.)  "To state a claim for aiding and

abetting unlawful discrimination or retaliation [under NYSHRL], a plaintiff must plead that the defendant 'actually participate[d]' in the unlawful conduct of the principal actor." *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 333 (S.D.N.Y. 2024) (quoting *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)).  A defendant may be held personally liable under the NYSHRL if he or she "actually participates in the conduct giving rise to a discrimination claim." *Achee v. Inc. Vill. of Valley Stream*, No. 20-CV-5294, 2023 WL 7130717, at *13 (E.D.N.Y. Oct. 30, 2023) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995)).  "[T]he case law establishes beyond cavil that a supervisor's failure to take adequate remedial measures can rise to the level of 'actual participation' under NYSHRL § 296(6)." *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 384 (S.D.N.Y. 1999).

The hostile work environment and retaliation claims against Dircksen & Talleyrand cannot serve as a predicate for the aiding and abetting claim against it "[s]ince a defendant cannot aid and abet its own violation of the NYSHRL and NYCHRL." *Rossbach v. Montefiore Med. Ctr.*, No. 19-CV-5758, 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021).  Nor can "a corporate employer be liable for aiding and abetting . . . . violation[s] by its employee," as the defendants point out, "because such a claim would be derivative of the primary . . . claim against the . . . employer."  (ECF No. 41 at 34 (quoting *Rossbach*, 2021 WL 930710, at *7).)  Therefore, the defendants' motion for summary judgment is granted as to the aiding and abetting claim against Dircksen & Talleyrand.[21]

### c.  Echevarria's Liability

"An employee may be held liable under the NYSHRL only under an aiding and abetting theory." *Kiseleva v. Greenspan*, 23-CV-9496, 2024 WL 4635463, at *9 (S.D.N.Y. Oct. 31,

---

[21] Additionally, the plaintiff has abandoned her NYSHRL claim for aiding and abetting because she did not respond to the portion of the defendants' opening brief addressing this issue.  (*See supra* note 17.)

2024); *see also Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023) (holding that individual defendant "cannot be held individually liable under the NYSHRL" and "can be held liable under the state statute only on an aider-and-abettor theory"). As discussed above, the plaintiff does not bring an aiding and abetting claim against Echevarria. Thus, Echevarria cannot be held individually liable under the NYSHRL.

The NYCHRL claim against Echevarria, however, can proceed. "Unlike the NYSHRL, the NYCHRL provides for direct individual liability." *Lee v. Riverbay Corp.*, No. 22-CV-7504, 2024 WL 4312166, at *17 (S.D.N.Y. Sept. 27, 2024). The NYCHRL makes it unlawful for "an employer or an employee or agent thereof, because of the actual or perceived . . . gender . . . of any person . . . [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)(a) (emphasis added). "[E]ven though the NYCHRL provides for individual liability of an employee regardless of ownership or decisionmaking power, a plaintiff must still show that the individual actually participated in the discriminatory conduct." *Moazzaz v. MetLife, Inc.*, No. 19-CV-10531, 2024 WL 1312995, at *11 (S.D.N.Y. Mar. 26, 2024) (internal quotation marks and citation omitted). "To actually participate in the discrimination . . . an individual need not himself take part in the primary violation." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 395–96 (S.D.N.Y. 2019) (citation omitted).

Here, the plaintiff has presented evidence from which a jury could find that Echevarria participated in the conduct giving rise to the hostile work environment claim under the NYCHRL. Echevarria's alleged comments about the plaintiff's physical appearance, his criticisms of her work performance, and his behavior on December 17th are part of the plaintiff's hostile work environment claims. *See, e.g., Lee*, 2024 WL 4312166, at *17 ("While there is only

a single instance in which Ellison and Klehammer are alleged to have made comments directed toward Plaintiff, their conduct nevertheless forms part of the basis of the actionable claims under the NYCHRL's broad standard for discrimination, as set forth in detail in the claims against the Corporate Defendants.").

With respect to the NYCHRL retaliation claim, the parties agree that Echevarria was not involved in the termination decision.  (Defs. 56.1 ¶ 79; Pl. 56.1 ¶ 79.)  However, Stamford told the plaintiff that her version of the December 17th incident was inconsistent with what other employees, including Echevarria, said.  (Pl. 56.1 ¶ 156; Buscaino Decl. ¶ 32; Stamford Dep. 24:25–25:09.)[22]  Steelman also testified that he spoke with Stamford and Echevarria "to determine what happened and what was going on."  (Steelman Dep. 77:16-18; *see also* Defs. 56.1 ¶ 70.)  Therefore, a jury could find that Echevarria influenced Steelman and Stamford's decision to terminate the plaintiff's employment.  *See, e.g.*, *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 666 (E.D.N.Y. 2015) (finding the plaintiff produced sufficient evidence for a NYCHRL retaliation claim against the defendant who engaged in the harassing conduct because the defendant "influenced the retaliation engaged in by the company" and the plaintiff's supervisors); *Schaper*, 408 F. Supp. 3d at 395 ("Courts in this Circuit have held that where the defendant 'supplies the intent and the complaints that may have led to Plaintiff's termination, a defendant may have 'actually participate[d] in the conduct giving rise to the plaintiff's . . . [NYCHRL] claims.'" (cleaned up) (citations omitted)).

Accordingly, the defendants' motion for summary judgment as to Echevarria is (1) granted with respect to the NYSHRL claims for hostile work environment and retaliation and (2) denied with respect to the NYCHRL claims for hostile work environment and retaliation.

---

[22] The defendants deny this statement, arguing that it is unsupported by the cited testimony.  (Defs. Reply 56.1 ¶ 156.)

## CONCLUSION

For these reasons, the defendants' motion for summary judgment is (1) denied as to the plaintiff's Title VII, NYSHRL, and NYCHRL claims for hostile work environment and retaliation against Dircksen & Talleyrand; (2) denied as to the plaintiff's NYCHRL claims for hostile work environment and retaliation against Echevarria; (3) granted as to the plaintiff's NYSHRL claim for aiding and abetting against Dircksen & Talleyrand; and (4) granted as to the plaintiff's Title VII and NYSHRL claims for hostile work environment and retaliation against Echevarria.  The parties are directed to file a joint pretrial order that complies with the Court's Individual Rules within 30 days of the date of this Memorandum Decision and Order.

**SO ORDERED.**

                                        s/Ann M. Donnelly

                                   _____

                                   ANN M. DONNELLY
                                   United States District Judge

Dated: Brooklyn, New York
       March 11, 2025